Audrey MEADOR, Appellant,

v.

The STATE of Texas, Appellee.

No. 12–87–00157–CR.

Court of Appeals of Texas,
Tyler.

Oct. 25, 1989.

Rehearing Denied Jan. 18, 1990.

613

Odis R. Hill, Longview, for appellant.

David Brabham, Rob Foster, Longview, for appellee.

Before RAMEY, C.J., and COLLEY and BILL BASS, JJ.

COLLEY, Justice.

Appellant Audrey Meador was convicted of criminal solicitation of capital murder [1] by a jury who assessed her punishment at life imprisonment and a $10,000 fine.

Appellant argues five points of error. First, she contends that the trial court erred in overruling her motion for instructed verdict of acquittal made at the close of the State's case in chief because the evidence is insufficient to corroborate the testimony of Titus McKee who the jury was instructed was an accomplice witness.

Second, appellant contends that the court erred in overruling her motion to quash the indictment because the special prosecutor lacked the authority to act as district attorney Pro Tempore in the case for the following reasons:

(1) The court failed to sign an order appointing Foster in this cause;

(2) The court's order, if any, was made after such attorney acted on behalf of the State before the grand jury which returned such indictment; and

(3) The attorney pro tem failed to file his oath of office with the trial clerk, all as required by Tex.Code Crim.Proc.Ann. art. 2.07(a), (c) (Vernon 1977).

---

1. Under Tex.Penal Code Ann. § 15.03(a), (d)(1) (Vernon 1974) and § 19.03(a)(3) (Vernon 1989).

Third, appellant contends the court erred in admitting into evidence over her hearsay objections a cassette tape recording of a telephone conversation between Titus McKee and Ben Sheffield.

Fourth, appellant argues that the court erred in admitting oral statements made by her while she was under arrest and being transported by the officers to a magistrate for arraignment because such statements were the product of custodial interrogation or its functional equivalent. She claims that the statements were involuntary, unrecorded, and therefore inadmissible under the provisions of Tex.Code Crim.Proc.Ann. arts. 1.05 (Vernon 1977), 38.21 (Vernon 1979), 38.22 § 3 (Vernon Supp.1989), Tex. Const. art. I, § 10, and U.S. Const. amends. V and VI.

Fifth, appellant alleges that the court erred in admitting the oral statements made by her while under arrest and in the custody of police officers at the Kilgore Police Station for the same reasons stated in her fourth point of error. In support of this point of error, appellant cites the same provisions of the state and federal constitutions and state statutes listed in her fourth point of error. We will reverse and remand.

## I.

### GENERAL BACKGROUND INFORMATION

Wayne P. Hutson, a Texas Eastman employee, was shot to death on an oil lease located north of the loop in Longview. His body was found on the morning of September 18, 1985. Hutson was survived by his wife, Bennie, who was the beneficiary of a life insurance policy insuring his life for the sum of approximately $200,000.00. The appellant is a sister of Bennie Hutson.[2]

Following a lengthy investigation,[3] Titus McKee, Ben Sheffield, Morris Phinney, and Terry Shannon were arrested in December of 1985 and later indicted for capital murder in connection with Hutson's death. On May 8, 1986, appellant was arrested and subsequently indicted for the capital murder of her brother-in-law, Wayne Hutson. The record shows that Titus McKee's May 2, 1986, oral statements and his written confession provided the information which brought about appellant's arrest and her initial indictment for capital murder.

Bennie Hutson and appellant lived in Longview where both were employed at Oil Bowl Lanes, a bowling alley. Ben Sheffield,[4] a black man, was a frequent visitor to the bowling alley. He knew appellant, and he occasionally placed bets on horse races for her. The evidence reveals that Sheffield, a Longview resident, was a drug dealer who in the past had sold drugs to Titus McKee (McKee) and his wife, Gail McKee (Gail). According to Gail's testimony at trial, she had at times worked as a prostitute for Sheffield.

On June 10, 1987, the indictment in this case was returned against appellant, charging her with solicitation of capital murder. On August 6, 1987, following appellant's conviction in the instant case, the trial court granted the State's motion to dismiss the indictment in trial court cause number 15,453–B (under which appellant was charged with capital murder) on the sole ground that the "case was re-indicted as cause number 16,009–B [this case]."

## II.

### APPELLANT'S POINT OF ERROR NO. 2

■ On May 8, 1986, appellant was arrested on a felony complaint for the capital murder of Wayne Hutson. On May 15, 1986, she was indicted for that offense in trial court cause number 15,453–B, and pretrial proceedings in that cause were conducted. In January, 1987, the Honorable

---

2. Paulette Powell, another sister of both appellant and Bennie Hutson, lived in Hallsville, Texas.

3. The lead officer in this investigation was Captain Larry Smith of the Gregg County Sheriff's Department. Captain Smith was the head of the

Criminal Investigations Division of the Gregg County Sheriff's Department.

4. Sheffield, who did not testify at trial, was an accomplice to the offense as a matter of law.

David Brabham, the duly elected District Attorney for Gregg County informed the trial judge by letter [5] that he was disqualified to prosecute appellant for the capital murder offense. On January 16, 1987, the trial judge issued a written order, finding that Brabham was disqualified "to represent the State ... in [cause number 15,453–B]....[,]" and by the same order appointed the Honorable Rob Foster "Attorney Pro Tem. to represent the State of Texas in [cause number 15,453–B]...." On June 10, 1987, appellant was indicted in this case for solicitation of capital murder under trial court cause number 16,009–B.

On July 6, 1987, the trial court conducted a pretrial hearing in this cause. At that hearing, the court announced the appointment of Rob Foster as attorney Pro Tem., and stated that "this court has heretofore ordered all motions that were filed in [cause number 15,453–B] be transferred into this [cause number 16,009–B] cause...." The court orally ordered that "all records of [pretrial] motions in cause number 15,453–B be made a part of the record in this cause [cause number 16,009–B]."

Following those pronouncements by the court, the State, represented by Mr. Foster, and defense counsel announced ready to proceed. A pretrial hearing was conducted in which appellant established that Brabham was the duly elected District Attorney for Gregg County, Texas; that Foster presented the present case to the grand jury and secured the indictment against appellant; that the January 16, 1987, order appointing Foster attorney Pro Tem. is the only order appointing Foster to represent the State in any cause to which appellant is a party defendant. Following the evidentiary hearing, appellant made an *oral* motion to "quash the indictment," which was promptly overruled by the trial court. Appellant also made a general objection to

Foster's participation in this case but that objection was not ruled on by the trial court.

In support of her claim, appellant contends that because (1) the court made no written order appointing the special prosecutor as District Attorney Pro Tempore in this cause, (2) Mr. Foster acted on behalf of the State before the grand jury which returned the indictment, (3) and Mr. Foster failed to file his oath of office, the indictment should be quashed, or the conviction reversed, citing Tex.Code Crim.Proc.Ann. art. 2.07(a), (c) (Vernon 1977) (hereinafter article 2.07).

We overrule appellant's second point of error. The motion to quash was not in writing as required by Tex.Code Crim.Proc. Ann. art. 27.10 (Vernon 1989). Therefore, the errors, if any, are not preserved for review. *Faulks v. State,* 528 S.W.2d 607, 609 (Tex.Cr.App.1975); *see also Nichols v. State,* 653 S.W.2d 768, 769–770 (Tex.Cr. App.1981).[6]

### III.

### TESTIMONY

#### TITUS McKEE, ACCOMPLICE WITNESS

■ McKee testified that he became acquainted with Ben Sheffield in 1984. He stated that he met Ben Sheffield at a house in Longview where he had gone to buy drugs. He stated that he and his wife, Gail, later lived for a time with Sheffield and his wife. McKee stated that in 1985 about "the end of August or right at the very first of September" Sheffield approached him and asked, "[I]f I needed—if I wanted to make some money ... and I ... stated if it was legal, I needed to make some money." McKee testified that Sheffield told him on that occasion that "he was talking about plenty of money." McKee recounted that Sheffield took him to the Oil Bowl lanes and introduced him to appel-

---

5. Defendant's pretrial Exhibit No. 1.

6. We must not be understood as approving the State's argument that a quo warranto proceeding is the sole remedy to challenge the authority of an attorney pro tem to prosecute a criminal case when the duly elected district attorney is

disqualified. Indeed, in our opinion, *State v. Gonzalez,* 26 Tex. 197 (1862), *State v. Johnson,* 12 Tex. 231 (1854), and *Hawkins v. State,* 628 S.W.2d 71 (Tex.Cr.App.1982), are inapposite where the requirements of article 2.07(a) and (c) are not met.

lant. According to McKee, appellant asked him "if I knew what I was there for. And I just told her yeah, because I knew it was behind one of his [Sheffield's] games, schemes, or whatever was coming down." McKee explained that he thought Sheffield was planning "some kind of con game or something." McKee said that appellant "asked ... if [he] could keep [his] mouth shut." He testified that he told appellant that he could. He stated that Sheffield and appellant then talked outside of his presence at another location in the Oil Bowl. Then, according to McKee, he and Sheffield left the Oil Bowl and drove to the Little Chain Grocery Store. On that trip, McKee testified that Sheffield told him, "[T]hat lady [referring to appellant] wants a man offed [sic]." In response to the prosecutor's question, McKee explained that "offed" meant "killed." McKee said Sheffield told him that "all [he would] have to do was drive a car and he'd [Sheffield] take care of the rest." McKee testified that he told Sheffield he would "think about" the offer. He said that two days later he encountered Sheffield at the Little Chain Grocery Store where his wife, Gail, worked. There, according to McKee, Sheffield asked him if he had "made up my mind whether or not I was going to drive the car....[,]" and he told Sheffield that he would, whereupon Sheffield informed him that the compensation for his participation would be $6,000. McKee testified that following that conversation, he and Sheffield drove to the Oil Bowl where "Audry [appellant] was [to show them] where ... [the victim] ... could be found. And that's when Ben said it would be best if I went with her." McKee explained that the reason for this was "because I was white and she was white."

McKee testified that he rode with appellant in her car to a "big nice brick house" and to appellant's residence in the Fairmont Apartments off Gilmer Road, and then returned to the Oil Bowl.[7] He said he reported to Sheffield "where all we had went [sic]." McKee stated that two days later Sheffield returned to the Little Chain

Grocery Store and transported him to the Oil Bowl where Sheffield and appellant again talked outside his presence. McKee stated that "they" told him "some Longview detective was asking how come [Sheffield] was coming to the Oil Bowl Lanes regular[ly]. [Sheffield] said he was scared—that he was hot.... [H]e was wanting to know if I would do it—kill Mr. Hutson." McKee testified that appellant was not present during that part of the conversation. McKee told Sheffield that he could not murder Hutson, but that he would recruit a killer.

McKee then related that he had persisted in "trying to talk [appellant] out of the money...." in advance. He stated that on one occasion he suggested to appellant that if she would take drugs (Dilaudids) she, herself, could "do it." He stated that appellant "made a phone call, came back, and said she wasn't going to do that." Following that episode, McKee related that he continued to press appellant to pay him at least one-half of the money in advance, but was unsuccessful in the effort.

McKee stated that appellant did advance him money at different times for motel, gasoline, and meals. He said that appellant supplied him with "twenty, forty, sixty dollars a day" for expenses for the purpose of "following Mr. Hutson," which, according to McKee, he "never did."

McKee testified that during this interval of time, at appellant's request, he was to follow Hutson for the purpose of "[finding] out where the best place would be to get him."

Later testimony of McKee was to the effect that he had no intention of killing Hutson. He stated that he hired Morris Phinney, a stranger to him, and told Phinney "that if he could—whenever the time come, if he could get this man [Hutson] away from the phone and make sure he didn't answer no [sic] phone long enough for me to collect the money, that I'd give him [a] hundred dollars. And he said he'd

---

7. During this time with appellant, McKee testified that he inquired about the "financial arrangements" and testified that appellant "said three thousand...."

go for that as long as there wasn't any killing involved."

McKee testified that on September 17, 1985, he went to the Oil Bowl where appellant told him, "[I]t had to be done now—pretty quick before a divorce date." After that testimony, McKee recounted that some three days to a week later [before September 17, 1985], at appellant's request, he met appellant at a sport's field in Longview where appellant "was going to show [him] what kind of vehicle [Hutson] drove and what he looked like." McKee said appellant pointed out Hutson's van, but that he never saw Hutson on that day because Hutson remained in his van and then drove off. As McKee put it, he never saw Hutson because he "never got out [of the van]" and "left out of there in a pretty big hurry." However, McKee testified that later that day he went to the Oil Bowl where appellant gave him Hutson's photograph which, according to his later testimony, he destroyed and discarded.

McKee testified that on September 17, 1985, Sheffield came to the Little Chain Grocery Store and gave him a "gun wrapped in a towel," and told him, "[I]t's now or never....[,]" and informed him, "the lady" told him (Sheffield) that Hutson was at her apartment. McKee testified that he put the pistol in his car trunk and left the Little Chain Grocery Store to pick up Morris Phinney. He related that he and Phinney drove to "Audry's house" (Fairmont Apartments) where Phinney forced Hutson into Hutson's own van and made him drive to the scene of the killing.[8]

Sheffield, who was indicted for the capital murder of Hutson, did not testify. The only *direct* testimony of appellant's alleged solicitation of McKee to kill Hutson for

money came only from the mouth of the accomplice witness, Titus McKee. McKee's testimony clearly shows that appellant personally did not expressly solicit McKee to do the actual killing of Hutson. From McKee's testimony, it is plain that, at least initially, Sheffield solicited McKee only to drive the vehicle in which Hutson was to be taken to the place of his murder. However, under the evidence, McKee clearly agreed to aid and assist in the planned murder. He was, therefore, a party to the offense, criminally responsible for the conduct of the person or persons ultimately solicited to murder Hutson for remuneration.[9] Moreover, during the period of time elapsing between early September 1985 and September 17, 1985, according to McKee's testimony, he did agree with appellant's intermediary, Ben Sheffield, to recruit the killer himself without further action on Sheffield's part. Although McKee's testimony shows that he personally did not intend to commit the murder, his evidence establishes that the solicitation was serious—that is, that appellant intended that he, or some other person, act on the same.

### THE NON-ACCOMPLICE WITNESSES [10]

In the case before us the material non-accomplice witnesses were Paulette Powell, John Easley, and McKee's wife, Gail.

### GAIL McKEE

Gail testified that she did not meet appellant until after the killing. She stated that on the evening of September 17, 1985, her husband, Titus McKee, came to her place of work (Little Chain Grocery Store) and that he "was not hisself [sic]." She stated

---

8. McKee testified at length about the actual killing of Hutson. He said that he shot Hutson accidently. He also testified that he, Morris Phinney, and Phinney's girlfriend, Terry Shannon, were at the scene of the murder. And he testified to facts and events which clearly establish that both Phinney and Shannon participated as parties to the abduction and murder of Hutson.

9. *See* Tex.Penal Code Ann. §§ 7.02 and 15.03(a) (Vernon 1974).

10. The trial court instructed the jury that Titus McKee was an accomplice witness, as a matter of law, and submitted to the jury as fact questions whether Gail McKee and John Easley were accomplice witnesses, together with additional instructions to guide the jury's decision if they found that either Gail or Easley, or both, were also accomplice witnesses. In view of the guilty verdict, we presume the jury found that Gail McKee and John Easley were not accomplice witnesses.

he went directly to a bathroom in the store. She said she followed him to the bathroom, and saw him holding a "spoon full of Dilaudids." [11] She related that McKee at no time told her "what was going on." Gail testified that sometime after September 17, 1985, McKee and Sheffield requested her to call appellant and tell her that she "was Titus' wife and wanted to know if [she] could meet with her." Gail said that when she called, the appellant instructed her "to come up there to the bowling alley." Gail said she went to the Oil Bowl alone, and that as she walked in, "Audry walked up and said come into my office...." Gail stated that appellant handed her "two or three books," one of which contained money. Gail testified that appellant told her "to pretend ... [that she] came there to buy the books." Gail testified that on this occasion she informed appellant that "Titus and them [sic] wanted me to come, and I came to pick up some money." She stated that appellant told her, "I've got it inside this book, and for me not to come back to the bowling alley. And if need be, if I had to come back or call the bowling alley, for me to use the name of 'Mary.'" Gail testified to four other occasions on which appellant gave her money: one at a Wal–Mart store on the loop in Longview, one at a convenience store across the street from the Oil Bowl, one at the Little Chain Grocery Store [12] where Gail was working, and one at the "place where you eat" in the Oil Bowl. She also testified that on a fifth occasion that she, her husband and child, and John Easley met appellant in a movie theatre where appellant "handed [McKee] some money and told us to leave town, that it was very hot...."

Gail testified that she was arrested on December 9, 1985, for theft; and that her mother, who lived in Hallsville, made her bond. After being released, she said she went to her mother's home.[13] Almost immediately she voluntarily admitted herself to a drug rehabilitation center in Marshall, where she stayed for ninety days. She testified that although she had never given appellant her mother and sister's address in Hallsville, she received money orders there which "sometimes ... [had her] name on it [a]nd then sometime, it would have my sister's name on it." Gail testified that these money orders, each in the amount of $300, came to her sister's house "once a month" while she was under treatment at the drug center. She testified that Ben Sheffield knew "about [her] sister" and related that Sheffield had "called us over there before."

Gail then testified that appellant had told her that "if Titus ever got put in jail, she would take care of me, I would not have to worry about it if she was going to be involved in any way." Gail also testified that appellant informed her that she would send money "through the mail." Gail stated that the money orders continued to come in the mail "until she [appellant] got arrested."

Gail stated that after her husband had signed a written confession in December, 1986, she told Captain Larry Smith about the payments made to her and her sister. She stated that at Smith's direction, she called appellant at the Oil Bowl and told her, "[M]y name is Mary, and I ... I [need] to talk with [you]—to meet somewhere ... [and] I ... needed to move out of town." Gail testified that after the call she received a letter at her "sister's house in Hallsville." She said, in compliance with Smith's instructions, the letter was placed in a plastic bag and brought to Smith's office where it was opened in her presence. She testified the letter contained $500 in cash wrapped in a paper towel upon which had been written, "furniture hot, stay away."

## PAULETTE POWELL

Paulette Powell (Powell) testified that a female called her on the telephone at her

---

**11.** Synthetic Heroin.

**12.** On this occasion Gail testified that appellant bought some beer, paid Gail an undisclosed sum of money, and told her to "keep the change."

**13.** Gail's sister, Paulette Powell, lived with their mother in Hallsville.

home in Hallsville, and told her that "they owed some money on some furniture, and wanted to know my address." Powell testified she gave the caller, who sounded white, her Hallsville address. Powell also testified that near Christmas 1986 she received two money orders totalling $300 payable to her. Powell also corroborated Gail's testimony regarding the letter containing the $500 in cash.

## JOHN EASLEY

John Easley (Easley), a long-time friend of the McKee's, testified that he was recruited by McKee to assist McKee in collecting money from appellant. Easley testified that on one occasion he went to the Oil Bowl by himself to collect money for McKee. He stated that, as instructed by McKee, he told the appellant "Snake sent me up here, and he told me to tell you that he knew that you had somebody set up.... And she looked at me kind of strangely and didn't say nothing. And then she told me to meet her later on ... at the K–Mart parking lot [at two o'clock the next day]." Easley testified that he and McKee kept the appointment, but that appellant did not. He testified that he then went back to the Oil Bowl where he saw appellant, who told him to wait. About that time, he stated two men came "and almost cornered me in there ... and I slipped around them and came back out and left." Easley stated that he went home and called appellant and "asked her what was going on. And she said that there were supposed to have been some men that owed some money to—or something.... I didn't quite understand it." Easley then testified that appellant "told [him] that she'd meet me again at the K–Mart parking lot the next day at 2:00 o'clock." Easley testified that again appellant did not appear, so he and McKee went to the Oil Bowl. According to Easley, McKee waited outside in the truck while Easley went in and met appellant who gave him an envelope "on a clothes pin," and told him "that she wasn't going to pay [that] but once." Easley stated that appellant then asked him "if [he] knew what this

was over?" He said he "told her no [a]nd she said it was over a pool debt." Easley testified that there was $1,500 in the envelope which he gave to McKee. He stated McKee gave him $300 of that money.

Easley testified that on another occasion McKee asked him to accompany him to a movie theatre on the mall in Longview. He said that he, McKee, and McKee's wife and child drove in two vehicles to the theater, and that shortly after they arrived, appellant came in and sat down next to McKee. Easley stated that he saw no money change hands at the theater, nor did he see anything "suspicious." Easley recounted that he accompanied McKee to the convenience store across from the Oil Bowl; that McKee called appellant on the telephone from that store, and that shortly, appellant drove up to the store and talked with McKee for about fifteen minutes and then left. Easley stated that he did not see any exchange of money on that occasion either. There is evidence in the record, independent of the testimony of McKee, Gail, and Easley that reveals that Hutson and his wife, Bennie Hutson, were having marital problems.

Further evidence reveals that Hutson owned a life insurance policy in the sum of $198,509.78, and that Hutson's wife, Bennie, was the sole beneficiary thereof. The record also shows that Bennie Hutson and appellant worked together at the Oil Bowl and apparently were living together [14] at the time of appellant's arrest.

## IV.

### APPELLANT'S POINTS OF ERROR NOS. FOUR AND FIVE

In appellant's fourth and fifth points of error, she claims that certain oral statements made by her following her arrest were inadmissible because they were the product of custodial interrogation, or its functional equivalent, and were involuntary and unrecorded.

Appellant's pretrial motion to suppress the oral statements made to Captain Larry Smith and Ranger Glen Elliott was over-

14. Although that fact is not absolutely established by the record.

ruled.[15] The record reflects that appellant made two sets of oral statements after her arrest on May 8, 1986. One set was made to the officers while appellant was being transported to the Kilgore office of Jack Baggett, Justice of the Peace of Precinct 4, Gregg County. The other set was made by appellant at the Kilgore Police Station after Judge Baggett had administered appropriate *Miranda* warnings to her. As we interpret the record, appellant repeated all of the oral statements[16] at the police station that she had made on the way to Judge Baggett's office. However, she made two additional statements at the police station in response to custodial interrogation, viz., (1) she told officer Smith "that some friends of hers had been in town by the last name of Edie, and that they had used her car and ... [the car] had been seen in some undesirable locations....''; and (2) "[s]he told [Smith] that [he] was after her because of her son getting off on a manufacture of methamphetamine charge in Gregg County.''

▪ Regarding the first set of oral statements, we conclude that the record supports the trial court's findings that those statements were not the product of custodial interrogation or its functional equivalent, and were voluntarily made by appellant. Hence the admission of those statements into evidence did not violate appellant's state or federal constitutional rights. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Further, we conclude that those statements were not inadmissible under article 38.22, section 3 or the other statutes[17] cited by appellant. Appellant's fourth point of error is overruled.

▪ The record clearly demonstrates that the second set of oral statements were the product of *custodial* (police) interrogation, and were *unrecorded.* Therefore, these statements were inadmissible under

the provisions of article 38.22, section 3(a)(1). The court erred in admitting the statements into evidence. Therefore, we sustain appellant's fifth point of error, but conclude that this error was harmless under the standard of Tex.R.App.P. 81(b)(2).

### V.

### APPELLANT'S POINT OF ERROR NO. 1

Our task is to determine whether the "combined weight of the non-accomplice evidence even if it is entirely circumstantial," tends to connect appellant with the solicitation offense. (Citations omitted.) *See Richardson v. State,* 700 S.W.2d 591, 594 (Tex.Cr.App.1985); *Gamez v. State,* 737 S.W.2d 315, 323 n. 10 (Tex.Cr.App.1987); and *Reed v. State,* 744 S.W.2d 112, 124–125 (Tex.Cr.App.1988). If it does, it is sufficient to corroborate McKee's testimony under Tex.Penal Code Ann. § 15.03(b) (Vernon 1974) (hereinafter referred to as section 15.03), and Tex.Code Crim.Proc.Ann. art. 38.14 (Vernon 1979) (hereinafter referred to as article 38.14).

Section 15.03(a) and (b) reads, in pertinent part, as follows:

(a) A person commits an offense if, with intent that a capital felony ... be committed, he requests, commands, or attempts to induce another to engage in specific conduct that, under the circumstances surrounding his conduct as the actor believes them to be, would constitute the felony, or make the other a party to its commission.

(b) A person may not be convicted under this section on the uncorroborated testimony of the person allegedly solicited and unless the solicitation is made under circumstances strongly corroborative of both the solicitation itself and the

---

**15.** After a pretrial evidentiary hearing, the trial judge dictated his findings into the record. He found that *none* of the oral statements was a product of custodial interrogation, and that appellant was administered proper *Miranda* warnings, which she understood, and that each statement of appellant was voluntarily made.

**16.** Essentially derived from Captain Smith's testimony.

**17.** Tex.Code Crim.Proc.Ann. art. 1.05 (Vernon 1977) and art. 38.21 (Vernon 1979).

actor's intent that the other person act on the solicitation....

Article 38.14 reads as follows:

A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense.

In our evaluation of the evidence under the foregoing statutes, we are guided by the opinions in *Reed, Gamez,* and *Richardson.* The court in *Gamez* carefully wrote that, in testing the sufficiency of the corroboration in cases like ours, the court

must eliminate from consideration the evidence of the accomplice witness and then examine the evidence of the other witnesses to ascertain if it is of incriminating character which tends to connect the defendant with the commission of the offense. If there is such evidence, the corroboration is sufficient; otherwise it is not. (Citations omitted.) The corroboration testimony need not directly link the accused to the crime or be sufficient in itself to establish guilt. (Citations omitted.)

*Gamez,* 737 S.W.2d at 323 n. 10.

■ The appellant makes a strong argument that the corroboration testimony raises only a strong suspicion or probability of her guilt. She emphasizes conflicts in the evidence between McKee's testimony and that of the non-accomplices. She urges us to apply the exclusion of reasonable hypothesis test [18] to the circumstantial evidence presented by the non-accomplice witnesses. We reject that argument. In this case the jury's guilty verdict rests both on the accomplice and non-accomplice witness' evidence. The accomplice witness' testimony of McKee *constitutes direct evidence* which if sufficiently corroborated and believed [19] by the jury is sufficient to support the verdict. The non-accomplice evidence by virtue of its "cumulative weight" and its incriminating character, need only tend to connect the appellant with the solicitation offense as required by section 15.03(b). It is not necessary that the corroboration evidence, independently considered, be sufficient to support the finding of guilt. *Reed v. State, Gamez v. State.* Therefore, in our view, an appellate court is not required to test *corroborative* circumstantial evidence to determine whether a reasonable hypothesis, excluding the guilt of the defendant,[20] arises therefrom.

■ The indictment in this case charges that appellant did then and there

intentionally, with intent that a capital felony be committed, namely, capital murder of an individual, Wayne Hutson, request, command and attempt to induce Titus McKee to engage in specific conduct that, under the circumstances surrounding the conduct of Titus McKee as the said Audry Meador believed them to be, would constitute such capital murder, and such specific conduct was as follows, to wit: The said Audrey Meador did request, command and attempt to induce the said Titus McKee to murder Wayne Hutson for remuneration and promise of remuneration, to wit: Money.

The court's charge at the guilt-innocence phase essentially tracked the indictment and authorized the jury to convict the appellant if they found and believed

from the evidence beyond a reasonable doubt that on or about the 17th day of September, A.D., 1985, in Gregg County, Texas, the defendant, Audrey Meador, did intentionally, with intent that a capital felony be committed, namely capital murder of Wayne Hutson, request or attempt to induce Titus McKee to engage in specific conduct that, under the circumstances surrounding the conduct of Titus McKee as the defendant, Audrey Meador, believed them to be, would constitute such capital murder, to-wit, that

---

**18.** *See Carlsen v. State,* 654 S.W.2d 444, 449 (Tex.Cr.App.1983) (opinion on rehearing).

**19.** *Cf. Ferguson v. State,* 573 S.W.2d 516, 524 (Tex.Cr.App.1978), *cert. denied,* 442 U.S. 934, 99

S.Ct. 2870, 61 L.Ed.2d 304 *rehearing denied,* 444 U.S. 888, 100 S.Ct. 190, 62 L.Ed.2d 124 (1979).

**20.** *Cf. Ferguson v. State.*

the said defendant did intentionally request or attempt to induce the said Titus McKee to intentionally cause the death of Wayne Hutson for remuneration or the promise of remuneration, to wit, money, then you will find the defendant guilty of criminal solicitation of Titus McKee to commit capital murder. Unless you so find from the evidence beyond a reasonable doubt, or if you have a reasonable doubt thereof, you will find the defendant not guilty of the offense of solicitation of Titus McKee to commit capital murder.

A painstaking review of the lengthy record in this complex case persuades us that the detailed testimony of the non-accomplice witnesses regarding appellant's post-murder payments to McKee, Gail, Powell, and Easley, together with the suspicious and secretive character of those payments, taken with the other evidence [21] of facts and circumstances, totally independent of the evidence of Titus McKee, is sufficient to corroborate McKee's evidence. Accordingly, appellant's first point of error is overruled.

## VI.

### APPELLANT'S POINT OF ERROR NO. 3

■■ By her third point of error, the appellant complains of the admission into evidence, over her timely hearsay objection, of the May 7, 1986, telephone conversation between McKee and Ben Sheffield. The record reveals that McKee placed a telephone call for Ben Sheffield from the office of Captain Larry Smith to the residence of Ben Sheffield's brother. At the time of the call Ben was at his brother's residence and, according to McKee, came to the phone. The following conversation [22] between McKee and Ben Sheffield occurred at that time:

Unidentified: Hello.

Operator: Collect call from Titus McKee. Will you accept?

Unidentified: Yes, I'll accept.

McKee: Hello?

Unidentified: Hey.

McKee: How's it going?

Unidentified: Okay. You all right?

McKee: Yeah, I'm tired of sitting. You got Ben's phone number?

Unidentified: Ben?

McKee: Yeah.

Unidentified: Yeah. You want to talk to him?

McKee: Yeah, I need to.

Unidentified: Just a minute. Ben. Believe it or not, he was just fixing to pull off, Titus.

McKee: Good.

Unidentified: Just fixing to pull off out there, outside there. What's going on?

McKee: Nothing much. Had a long sit—

Unidentified: Shit, I hear you.

McKee:—sitting here a long time.

McKee: Yeah.

Sheffield: But do you know who paid, or what?

McKee: Yeah, it has been.

Sheffield: Huh?

McKee: Yeah, I brought that eleven hundred over there that night. For all that.

Sheffield: Well, I don't know. I'd see Dee and she if she's got them. I guess she's still got them. I don't even know. I ain't never paid no attention. I ain't never paid no attention.

McKee: Say, you don't think that somebody will make my bond, do you?

Sheffield: How much is your bond?

McKee: Well, it's at $100,000 right now.

Sheffield: Can't you get a lawyer and get it down?

McKee: Well, I don't know. I just wanted—I don't know how much I can get yet.

Sheffield: I'm talking about getting a lawyer and get the bond down.

---

**21.** Including the taped May 7, 1986, conversation between McKee and Sheffield.

**22.** The cassette tape (State's Exhibit 35) is not a part of this record, but the substance of the conversation is set forth in appellant's brief and its contents are undisputed by the State.

McKee: Mine keeps on saying something about he won't do nothing until he knows I can get some money to get it down.

Sheffield: Who is the lawyer?

McKee: Kevin Settles.

Sheffield: (Inaudible)

McKee: You think that lady can do anything?

Sheffield: I don't know. I can check, you know.

McKee: Yeah. I tried to call her a little while ago and couldn't get her.

Sheffield: I can check.

McKee: All right.

Sheffield: I can check. Where's Gail at?

McKee: Well, she's off somewhere right now.

Sheffield: Yeah.

McKee: She's scared.

Sheffield: She ain't coming to visit?

McKee: Huh-uh.

Sheffield: She visited you?

McKee: Not much. She's too scared.

Sheffield: I'll check on the rings and that other—

McKee: Man, I don't understand this. You know?

Sheffield: (Inaudible)

McKee: I don't know—what did you do me this way for, man?

Sheffield: Huh?

McKee: What did you do me this way for?

Sheffield: I ain't doing nothing. Like they say, when it gets tight, you've got to help yourself. Maybe that's what you should do.

McKee: You're lucky he lied about it.

Unidentified: You ain't found out nothing yet, or worked out nothing? Got anything concrete?

McKee: No, just waiting for the court, I guess.

Sheffield: Hello.

McKee: Say.

Sheffield: Hey.

McKee: What's going on?

Sheffield: Ain't nothing to it.

McKee: O. I was wondering about Gail's rings.

Sheffield: Huh?

McKee: I was wondering about Gail's rings.

Sheffield: What about them?

McKee: Yeah.

Sheffield: Well, I don't know. I guess they've still got them, I guess.

McKee: Where can I get them from?

Sheffield: Huh?

McKee: Where can I get them from?

Sheffield: When can you get them from them?

McKee: Yeah. And how?

Sheffield: How much was there? I don't even know how much was it.

McKee: It's already paid.

Sheffield: What's already paid?

McKee: Set of rings.

Sheffield: Oh, yeah?

Sheffield: That ain't lying. If you remember out there, I'd say if you did out there, you'd know. If you're thinking right.

McKee: Do what?

Sheffield: I say, if you're thinking right.

McKee: Yeah, but see, I couldn't blame it on somebody else, like you're talking about.

Sheffield: Well, tell them who operated.

McKee: Huh?

Sheffield: Tell them who did it.

McKee: Tell them who did it? Then I'd be setting myself up.

Sheffield: What do you mean you'll be setting yourself up? You won't be setting yourself up.

McKee. Otherwise, I'd be putting something on somebody that don't deserve it.

Sheffield: If they did it, they deserve it, God damn it. To save yourself. Shit, you know how that go.

McKee: Well, as far as that goes, you know you kind of set it up, you know.

Sheffield: No, I ain't did nothing.

McKee: Well, you just talk to the lady for me and see if I can't do something.

Sheffield: I'll see.

McKee: I need to get a hold of her, but I can't get a hold of her. I tried to call out there, and they won't accept the call.

Sheffield: Uh-huh. I ain't saying that I can go out there and play cool and shit. I can't. Shit. Horses out running now.

McKee: Well I can't stay here. I don't want to stay in all this, you know. You all just leave me hang out to dry. I'm going to have to go pretty quick, man. The time is fixing to run out on the phone. And I'd appreciate you all thinking about it, talking about it, something.

Sheffield: Well, I'll check and see what's happening.

McKee: I need to.

Sheffield: All right.

McKee: Bye.

The State argues that the conversation was admissible under the co-conspirator rule.[23] For that contention to be correct, it must be found that the conversation occurred "during the course and in furtherance of the conspiracy" to murder Hutson for remuneration. The only discernible subjects of the conversation were "Gail's rings" and McKee's inability to post a bail bond of $100,000.00 in the capital murder case. Obviously, the description of "Gail's rings," which apparently had been pawned, has nothing to do with the furtherance of the conspiracy. The only portion[24] of the conversation which could conceivably be found to be in furtherance of the conspiracy is that portion relating to the bond.[25]

The question we must answer is whether the conversation amounts to statements made "during the course and in furtherance of the conspiracy." Tex.R.Crim.Evid. 801(e)(2)(E) (hereinafter referred to as Rule 801).

McKee's testimony is the sole source of the evidence establishing the *terms* of the conspiracy. According to McKee's testimony, on one occasion, before his arrest on December 9, 1985, but after the murder of Hutson on September 17, 1985, appellant told McKee in the event he was arrested she would "pay for [his] lawyer ... and see that [his] wife got so much a month." Aside from this, there is no evidence even remotely suggesting that the conspiracy included an agreement that appellant would make McKee's bail bond. Although McKee's testimony does establish that he was to be paid $3,000 or $6,000 for his participation in the murder, no evidence was presented as to when and in what amounts the money was to be paid to the accomplices. Furthermore, the evidence does not show *when* the total remuneration due to either Sheffield or McKee was paid, if it was. The main object of the conspiracy, the murder of Hutson, was accomplished on September 17, 1985. If all the money due McKee and Sheffield for their evil deed was paid before May 7, 1986, a date some 232 days or 7 months and 22 days after the murder, then the conversation between McKee and Sheffield did not occur during the course of the conspiracy and was therefore inadmissible, as the objects of the conspiracy had been accomplished. *Brown v. State*, 576 S.W.2d 36, 41 (Tex.Cr.App.1978).

The record reveals that the last money received by either Gail or Titus McKee was $500 in cash, mailed[26] to Gail's sister's home in Hallsville. As already noted, the money was received shortly after Gail, upon Officer Smith's suggestion, telephoned appellant and identified herself as "Mary" and said to the appellant, "I [need] to talk with [you] to meet somewhere ... [and] ... I [need] to move out of town." The record demonstrates that Gail's tele-

---

23. *See* Tex.R.Crim.Evid. 801(e)(2)(E), reading:

   (e) *Statements Which are Not Hearsay.*

   ....

   (2) *Admission by Party–Opponent.* .... (E) a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy.

24. Except for the conversation about the rings and the bail bond, the entire conversation is unintelligible and meaningless-utter nonsense.

25. In particular McKee's request of Sheffield, that he talk to that "lady" and see if she could "do anything" to help McKee make bail.

26. The envelope was postmarked May 2, 1986.

phone call was made, and the $500 in cash was received, before May 7, 1986.

Based on the record, we conclude that the State's evidence is insufficient to prove [27] that any promised remuneration under the conspiracy due the accomplices was unpaid on May 7, 1986. Hence we conclude that the conversation does not qualify as a statement by co-conspirators during the course of the conspiracy and in furtherance thereof. Moreover, the conversation was obviously a ploy on the part of the police authority to create evidence against appellant. The conversation did not occur during the course of the conspiracy, nor does it constitute statements in furtherance of the conspiracy as required by Rule 801. The entire conversation was inadmissible hearsay, and the court erred in admitting it into evidence. Appellant's third point of error is sustained.

■ Whether the error requires reversal presents a more difficult question. The record reveals that Captain Larry Smith, after setting up the telephone call by McKee to Sheffield, arranged a surveillance of the bowling alley by Deputy Sheriff Gene Anderson. Anderson testified that he observed Sheffield's arrival at the bowling alley at 3:10 p.m., some twenty-five minutes after the close of the taped conversation. Anderson stated that on that occasion he did not see appellant and Sheffield talking at the bowling alley. The State argues that the "evidentiary significance [of the conversation] consists of McKee's request that Sheffield contact 'that lady' and Sheffield's nonverbal conduct in departing to appellant's business [the bowling alley].[,]" but claims the error is harmless despite that discerned significance. In our opinion, due to the entirely circumstantial character of the corroboration testimony, the inadmissible conversation coupled with the testimony of Officers Smith and Anderson regarding Sheffield's prompt appearance at the Oil Bowl following the telephone conversation with McKee, impermissibly provides another piece of circumstantial evidence linking McKee with Sheffield and appellant, and linking Sheffield with appellant.

Under this record, we are unable to conclude beyond a reasonable doubt that the error in admitting the telephone conversation between McKee and Sheffield made no contribution to appellant's conviction.

The State in its closing argument referred the jury to the taped conversation and argued, in effect, that the conversation linked Ben Sheffield, who did not testify, to the appellant. He reminded the jury that according to Anderson's testimony, Sheffield arrived at the bowling alley twenty-five minutes after the close of the telephone conversation. In this regard, the State did introduce evidence that Sheffield's brother's house was 3.4 miles from the bowling alley. The State argued as follows: "And just because [appellant is] careful enough they [law officers] didn't see her talking to [Sheffield], you know that [sic]."

As the State maintains, Anderson's testimony respecting his May 7, 1986, surveillance of the Oil Bowl, and Sheffield's appearance there, were admissible evidence. However, it cannot be denied that its probative value, for corroborative purposes, was greatly enhanced by portions of the *inadmissible* conversation between McKee and Sheffield. That is particularly true with respect to McKee's question, "You think that Lady can do anything?," and Sheffield's answer thereto, "I don't know. I can check, you know." Doubtless, the inadmissible conversation is strongly corroborative of McKee's testimony that he and Sheffield were personally well acquainted, a fact in itself corroborative of all of McKee's testimony.

Because of our ruling on appellant's third point of error, we reverse the judgment and remand the case for a new trial.

---

**27.** Under the preponderance of the evidence standard. *Bourjaily v. United States,* 483 U.S. 171, 107 S.Ct. 2775, 2779, 97 L.Ed.2d 144 (1987); *see also Ward v. State,* 657 S.W.2d 133, 136–137 (Tex.Cr.App.1983).