Chandrasekhar IVATURY, Appellant,

v.

The STATE of Texas, Appellee.

No. 05–89–00564–CR.

Court of Appeals of Texas,
Dallas.

July 6, 1990.

John Hagler, Dallas, for appellant.

Pamela Sullivan–Berdanier, Dallas, for appellee.

Before HOWELL, KINKEADE and BURNETT, JJ.

## OPINION

KINKEADE, Justice.

Chandrasekhar Ivatury appeals his conviction of criminal solicitation of capital murder. After a jury found him guilty, it assessed punishment at twenty years' con-finement in the Texas Department of Corrections[1] and a $10,000 fine. Ivatury argues: (1) that the evidence is insufficient to support his conviction; (2) that the State did not disprove Ivatury's theory of entrapment; (3) that the State committed *Batson* error during jury selection; and (4) that the trial court erred when it allowed evidence of extraneous offenses and when it denied his motion to suppress evidence. Because (1) sufficient evidence exists to support Ivatury's conviction and disprove his theory of entrapment; (2) Ivatury lacked standing to allege a *Batson* error; and (3) the trial court did not commit reversible error, we affirm the judgment of the trial court.

## FACTS

Patrick Fahey, a United States Customs Service agent, first became aware of Chandrasekhar Ivatury during a December 1988 investigation of an illegal transfer of high technology to Communist Bloc countries. After Ivatury heard that Agent Fahey was asking questions about him, he called Agent Fahey to set up a meeting. Ivatury told Agent Fahey that in exchange for complete immunity and the right to carry a gun, he could guarantee an espionage conviction against the primary individuals under investigation based on a computer tape he possessed about the Stealth bomber. Ivatury also indicated he had information regarding the removal of technical data from a defense contractor, the December murder of the owner of the Million Dollar Saloon, and the production and sale of counterfeit United States passports and entry stamps. The government refused Ivatury's request for immunity and Agent Fahey obtained a grand jury subpoena to acquire the computer tape, which Ivatury never produced. Unable at this point to further pursue the espionage investigation of Ivatury, Agent Fahey proceeded to the next area of investigation, passport fraud.

In pursuit of this new investigation, Agent Fahey instructed Michael Borer, a confidential informant, to call Ivatury in an attempt to obtain a counterfeit passport. Borer and Ivatury exchanged numerous

1. Now Texas Department of Criminal Justice, Institutional Division.

phone calls and finally agreed to meet. During one of the taped phone calls, Ivatury told Borer that if Agent Fahey kept pushing his buttons, Agent Fahey was going to get hurt. Later at the tape recorded meeting, they also discussed Agent Fahey. Ivatury stated to Borer that he had asked his lawyer what would happen if "he took Agent Fahey out." The lawyer told him that he would have about ten thousand FBI agents "standing on him." After reviewing these tapes, Agent Fahey's supervisor instructed Borer to continue the investigation of the passport fraud and to ask Ivatury at their next face-to-face meeting if he was serious about killing Agent Fahey. During that next meeting, Borer told Ivatury that he knew "a kid from the Philippines [who was in reality undercover agent Enrique Villarma] that would do him [Agent Fahey] in a heartbeat," to which Ivatury responded "How much?" and asked for his phone number. In a later phone conversation with Borer, Ivatury stated he had a photograph of Agent Fahey that Villarma could use to identify him.

Upon Villarma's arrival in Dallas, Ivatury met with him in Villarma's hotel room. Due to technical difficulties the agents were unable to tape this meeting, but Agent Fahey, who was in the next room, overheard the entire meeting through a connecting double door. Ivatury told Villarma what he wanted done. After Villarma asked Ivatury if he knew who he was dealing with when he said the man he wanted to kill was a customs agent, Ivatury responded "Yes, this is no big deal. I have done it before." They then discussed how and when Villarma would make the hit and how much it would cost. In a subsequent phone conversation, Ivatury gave Villarma Agent Fahey's work address and telephone numbers. The two then arranged a second meeting. Ivatury missed the meeting because he said he lacked transportation. The two then arranged for Villarma to pick Ivatury up for another meeting. At this meeting Ivatury offered to provide a computer, a high power rifle, portable telephone, or anything else Villarma might need to make the hit. After this

meeting, Agent Fahey placed Ivatury under arrest.

Agent Fahey obtained a search warrant for Ivatury's house and safety deposit box. Although not specifically listed as an item sought in the search warrant, Agent Fahey discovered a computer tape, of the special type used in the defense industry, in the safety deposit box. However, neither of the searches conducted pursuant to the warrants produced a rifle, picture of Agent Fahey, or money.

## *BATSON* ERROR

■ In his fourth point of error, Ivatury contends that the State committed *Batson* error during jury selection. Ivatury, a man of East Indian origin, argues that the State's striking of three black venirepersons violated his right to due process and equal protection.

After voir dire and noting that the State used three of its peremptory strikes against black venirepersons, Ivatury requested a *Batson* hearing. Without making a ruling, the trial court allowed a hearing. Later, the trial court noted for the record that although the three venirepersons struck were black and Ivatury is a native of India and therefore did not fit into that racial group, it nonetheless had allowed a hearing. At the hearing, the State offered the following explanations for striking the three venirepersons. The State stated that it struck juror 16 because she kept dozing off, an explanation the court corroborated. Next, the State stated that it struck juror 17 because he had been falsely accused of and indicted for burglary and, consequently, might harbor bad feelings against the State. However, this juror later stated he would not hold the prior indictment against the State. Finally, the State stated that it struck juror 21 because he worked as a technician at Parkland Memorial Hospital and that he was rated as a bad juror during prior jury service. After the trial court stated that out of five potential black jurors, that one served, the State had struck three, and Ivatury had struck one, it overruled Ivatury's objection.

For Ivatury to raise a claim of *Batson* violation, he must belong to the same racial group as the challenged veniremen belong. *Batson v. Kentucky*, 476 U.S. 79, 96, 106 S.Ct. 1712, 1722–23, 90 L.Ed.2d 69 (1986); *Mead v. State*, 759 S.W.2d 437, 444 (Tex. App.—Fort Worth 1988, no pet.). Ivatury originates from East India and did not state that he was black or of African–American descent. He challenged the State's striking of three African–American venirepersons. We question, as did the trial court, whether Ivatury established a prima facie case. Nonetheless, once the trial court held the hearing, whether a prima facie case existed became irrelevant and, therefore, we need to address the State's explanation for striking the venirepersons.

■ The State may base its racially neutral explanations on non-verbal behavior. *Branch v. State*, 774 S.W.2d 781, 784 (Tex. App.—El Paso 1989, writ ref'd). In the instant case, the State struck juror 16 after it observed her dozing off and the court corroborated the State's observation. This was a sufficient racially neutrally explanation. The State struck juror 17 because of a prior false arrest. The State struck juror 21 for a bad record during prior jury service. Both of these explanations serve as objective bases which would logically induce any prosecutor to exercise a peremptory challenge regardless of the ethnic background of the named panel members. *See Branch*, 774 S.W.2d at 783. In the instant case, the State rebutted any prima facie case when it gave racially neutral explanations for striking each of the three venirepersons at issue. Because the State gave racially neutral explanations for striking the three black venirepersons, the trial court's determination that the State did not commit *Batson* error during jury selection was not against the great weight and preponderance of the evidence. *See Meraz v. State*, 785 S.W.2d 146, 154–55 (Tex.Crim. App.1990); *Oliver v. State*, 787 S.W.2d 170, 172 (Tex.App.—Beaumont 1990, pet. granted). We overrule Ivatury's fourth point of error.

## ENTRAPMENT

■ In his third point of error, Ivatury contends that a rational trier of fact could not have found that the State disproved the theory of entrapment beyond a reasonable doubt. He argues that the United States Customs supervisor instructed Borer to pursue him and that Borer first mentioned murdering Agent Fahey.

Section 8.06 of the Texas Penal Code provides:

(a) It is a defense to prosecution that the actor engaged in the conduct charged because he was induced to do so by a law enforcement agent using persuasion or other means likely to cause persons to commit the offense. Conduct merely affording a person an opportunity to commit an offense does not constitute entrapment.

TEX.PENAL CODE ANN. § 8.06 (Vernon 1974). The entrapment defense becomes available if the officer specifically instructed his agent or informant to use an improper procedure to "make a case" against a particular defendant. *Rangel v. State*, 585 S.W.2d 695, 699 (Tex.Crim.App.1979). Section 8.06 adopts an objective test for entrapment, and once the court makes a determination that an inducement occurred, its only consideration becomes the nature of the police activity involved, without reference to the predisposition of the particular defendant. *Johnson v. State*, 650 S.W.2d 784, 788 (Tex.Crim.App.1983).

In the instant case, Ivatury told Borer that if Agent Fahey kept pushing his buttons, Agent Fahey was going to get hurt. Ivatury also told Borer that he had asked his lawyer what would happen if he took Agent Fahey out. Ivatury made both of these statements prior to the customs supervisor instruction to Borer to ask Ivatury at their next face-to-face meeting if he was serious about killing Agent Fahey. At that next meeting, after Ivatury continued to complain about Agent Fahey, Borer told Ivatury, "You ought to quit ... fuckin' with him. I got a kid from the Philippines who would do him in a heartbeat." Ivatury immediately responded, "How much?" and asked for the hit man's phone number.

Further, Borer testified at trial that he did not bring up the idea of killing Agent Fahey with Ivatury and that he never indicated to Ivatury that he would like to see Agent Fahey killed. This evidence shows that Ivatury originated the idea of harming Agent Fahey and that no inducement occurred. Because Ivatury failed to prove that the customs agents induced him to commit the offense, no entrapment occurred. We overrule his third point of error.

### SUFFICIENCY OF THE EVIDENCE

█ In his first and second points of error, Ivatury contends that the evidence is insufficient to support the conviction. Ivatury argues that the State failed to prove that he acted with the intent that a capital murder be committed. He further argues that the alleged solicitation was not made under circumstances "strongly corroborative" of his intent that the other person act on the solicitation. When determining whether the evidence is sufficient to support the conviction, we view the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Marroquin v. State*, 746 S.W.2d 747, 750 (Tex.Crim.App.1988); *Garrett v. State*, 682 S.W.2d 301, 304 (Tex.Crim.App. 1984), *cert. denied*, 471 U.S. 1009, 105 S.Ct. 1876, 85 L.Ed.2d 168 (1985).

To support a conviction for criminal solicitation pursuant to section 15.03 of the Texas Penal Code, the evidence must establish that the defendant acted knowingly and with a specific intent that a capital murder be committed. *Richardson v. State*, 681 S.W.2d 683, 687 (Tex.App.—Houston [14th Dist.] 1984), *aff'd*, 700 S.W.2d 591 (Tex.Crim.App.1985); *see* TEX. PENAL CODE ANN. § 15.03(a). Although the statute requires conduct of an active and positive nature, no requirement exists that the offense occur at the beginning of an actor's involvement in a criminal enterprise. *Schwenk v. State*, 733 S.W.2d 142, 147 (Tex.Crim.App.1987) (on motion for rehearing). The statute disallows a conviction for criminal solicitation based solely on the uncorroborated testimony of the person allegedly solicited. The circumstances surrounding the solicitation must strongly corroborate both the solicitation itself and the actor's intent that the other person act on the solicitation. *See* TEX. PENAL CODE ANN. § 15.03(b). In evaluating whether sufficient evidence of corroboration exists, this court eliminates from consideration the accomplice testimony and then determines whether other incriminating evidence remains, which tends to connect the defendant with the crime. *Richardson*, 700 S.W.2d at 594.

In the instant case, Ivatury first brought up the idea of harming Agent Fahey during a taped phone conversation with Borer. Ivatury affirmatively stated to Borer, "The way I look at it, he's gonna push one too many buttons as it is and the boy's gonna get hurt." During a subsequent tape recorded meeting with Borer, Ivatury relayed a conversation he had with his lawyer stating, "I told my lawyer that, okay, I said what if I take Fahey out, okay?" He further asked his lawyer, "I said Denver, what happens if Patric [sic] Fahey disappears?"

Agent Fahey testified that when he played these tapes for his supervisor, his supervisor became concerned for Agent Fahey's safety and instructed Borer at his next face-to-face meeting with Ivatury to ask him if he was serious about killing Agent Fahey and having him disappear. Pursuant to these instructions, after Ivatury continued to complain about Agent Fahey, Borer said, "You ought to quit ... fuckin' with him. I, I got a kid from the Phillipeans [sic] that would do him in a heartbeat." Ivatury immediately responded, "How much?" He later asked for the hit man's phone number.

Agent Fahey also testified to what he overheard at the first meeting between Ivatury and the hit man, Villarma. When Villarma asked Ivatury what he wanted, Ivatury responded, "I need to get someone taken care of." After Ivatury identified the person as a customs agent, Villarma said, "Do you know who you're ... fuckin' with?" Ivatury replied, "Yes, this is no big

deal. I have done it before." When Villarma quoted Ivatury a price of $10,000, Ivatury responded, "Fine."

In a subsequent taped phone conversation between Ivatury and Villarma, Ivatury furnished the hit man with Agent Fahey's name, work address, and phone numbers. He also agreed to bring the money and a photograph of Agent Fahey to their next meeting. Although Ivatury failed to appear for that meeting, he gave Villarma a plausible excuse for his nonappearance and set up a third meeting where he did appear.

Ivatury's words and conduct reflect an active and positive desire that a capital murder be committed. They indicate that he acted knowingly and with a specific intent to solicit Villarma to commit the capital murder of Agent Fahey. Even with the elimination of Villarma's testimony, sufficient incriminating evidence remains, which tends to connect Ivatury with the offense and strongly corroborates the seriousness of his intent. There remains Borer's testimony, the intended victim, Agent Fahey's testimony, and the tape recordings of Ivatury's communications with Borer and Villarma, which clearly evidence his intent. The tape recordings alone sufficiently corroborate Ivatury's intent. *Varvaro v. State*, 772 S.W.2d 140, 143 (Tex. App.—Tyler 1988, pet. ref'd). The intended victim's testimony also provides sufficient corroboration of Ivatury's intent. *Bell v. State*, 768 S.W.2d 790, 796 (Tex.App.— Houston [14th Dist.] 1989, pet. ref'd). Because the cumulative effect of the evidence sufficiently corroborates both the solicitation itself and Ivatury's intent that Villarma carry it out, we overrule Ivatury's first and second points of error.

## MOTION TO SUPPRESS

In his sixth point of error, Ivatury contends that the trial court erred when it denied his motion to suppress the Stealth Bomber computer tape. Ivatury argues that since the search warrant and affidavit for the safety deposit box failed to specifically describe the computer tape and only authorized the seizure of a photograph of Agent Fahey pursuant to articles 18.01 and 18.02 of the Texas Code of Criminal Procedure, the police seized the tape in violation of these provisions. *Scoggan v. State*, 736 S.W.2d 239, 245 (Tex.App.—Corpus Christi 1987, pet. granted); *see* TEX.CODE CRIM. PROC.ANN. arts. 18.01(d) & 18.02(10).

Ivatury misplaces his reliance on *Scoggan.* In that case, the warrant authorized seizure of photographs of nude minor females and clothing for minor females. In addition to these items, the police seized magazines containing sexually explicit material, cut out advertisements for sexually explicit magazines and books, pornographic pamphlets and other books with no apparent connection to the crime under investigation. *Id.* at 243, 245. The court in *Scoggan* correctly stated the general rule that evidence not described in a valid search warrant, but lawfully seized pursuant to the warrant, is admissible under the plain view exception. The police generally have a right to seize items in plain view when (1) the police have a right to be where they are, (2) they inadvertently discover the evidence, and (3) it is immediately apparent to them that they have evidence before them. The court then stated that articles 18.01 and 18.02 statutorily limit this general rule where the court issues the warrant to search for *mere evidence* and the items discovered constitute *mere evidence* outside the scope of the warrant. *Id.* at 245.

Mere evidence refers to evidence other than the fruits, instrumentalities, or contraband of a crime. *Warden, Md. Penitentiary v. Hayden*, 387 U.S. 294, 306–07, 87 S.Ct. 1642, 1649–50, 18 L.Ed.2d 782 (1967); *Snider v. State*, 681 S.W.2d 60, 63 (Tex. Crim.App.1984). In *Scoggan*, the items discovered and seized by the police constituted *mere evidence* outside the scope of the search and were unconnected with any apparent crime, but that is not true of the evidence seized in the instant case. Agent Fahey testified that, as a result of his training and experience, he recognized that the computer tape in the safety deposit box was consistent with the special type of tape used in the defense industry. Pursuant to the espionage investigation, Agent Fahey had previously testified that Ivatury had

offered to furnish him with a tape from a defense contractor containing information on the Stealth Bomber. The tape also evidenced the context of the offense and Ivatury's motive and specific intent that a capital murder be committed. The computer tape seized in the instant case constituted the fruit or contraband of the espionage for which Ivatury was also under investigation and, therefore, constituted more than *mere evidence*.

The State satisfied the three requirements of the plain view doctrine. First, Agent Fahey possessed a warrant to search the safety deposit box where the tape was found. Second, Agent Fahey inadvertently discovered the tape. Third, it was immediately apparent to Agent Fahey that he had evidence before him. The "immediately apparent" language of the third requirement, merely requires that the facts available to the officer would warrant a reasonable belief that the items in question may be contraband, stolen property, or useful as evidence of a crime. It only requires a practical, nontechnical probability that incriminating evidence is involved. *Texas v. Brown*, 460 U.S. 730, 736–42, 103 S.Ct. 1535, 1540–43, 75 L.Ed.2d 502 (1983). Agent Fahey possessed a reasonable belief that the computer tape constituted evidence of a crime. Because the seized computer tape constituted contraband of a crime, the limitations of articles 18.01 and 18.02 do not apply and the police lawfully seized the tape pursuant to the plain view doctrine. We overrule Ivatury's sixth point of error.

## EXTRANEOUS OFFENSES

In his fifth, seventh, and eighth points of error, Ivatury contends that the trial court erred when it admitted evidence of extraneous offenses. The court may allow the State to admit evidence of extraneous offenses: (1) to show the context in which the criminal act occurred; (2) to circumstantially prove identity; (3) to prove scienter; (4) to prove malice or state of mind; (5) to show the accused's motive; or (6) to refute a defensive theory raised by the accused. *Williams v. State*, 662 S.W.2d 344, 346 (Tex.Crim.App.1983); *Albrecht v. State*,

486 S.W.2d 97, 100–101 (Tex.Crim.App. 1972). This list is descriptive and not exhaustive. *Williams*, 662 S.W.2d at 346.

### *Stolen Computer Tape*

In his fifth point of error, Ivatury argues that the trial court committed reversible error when it allowed the admission of testimony as to the stolen computer tape. The court may allow the admission of evidence of an extraneous offense if the evidence is so closely interwoven with the offense on trial that it shows the context in which the offense occurred. The jury has a right to hear what occurred immediately prior to and subsequent to the commission of the offense on trial so that they may realistically evaluate the evidence. *Maynard v. State*, 685 S.W.2d 60, 67 (Tex.Crim. App.1985).

In the instant case, Ivatury's statements as to the stolen computer tape precipitated Agent Fahey's further investigation of Ivatury for passport fraud and involvement in other criminal activities. Agent Fahey's subsequent pursuit of the stolen tape also provides the motive for Ivatury's solicitation of the capital murder and serves to refute Ivatury's claim of entrapment. Because the State sought to introduce evidence of the computer tape to show the context in which the solicitation occurred, to show Ivatury's motive, and to refute Ivatury's claim of entrapment, the trial court did not commit reversible error when it allowed the admission of testimony as to the stolen computer tape. We overrule Ivatury's fifth point of error.

### *Trafficking in Cocaine*

In his seventh point of error, Ivatury argues that the trial court committed reversible error by allowing the admission of testimony as to cocaine trafficking. Ivatury specifically complains about the following nonresponsive answer given by Agent Fahey to explain Ivatury's tape recorded statements:

Q STATE'S ATTORNEY: After listening to that conversation, Agent Fahey,

what steps did you determine were necessary in the investigation?

A AGENT FAHEY: We determine that Jeff must continue talking to Shaker and meeting with Shaker because, after consulting my supervisor and the agent from our Narcotics Air Smuggling Group, we were of the professional opinion that Shaker was talking about importing cocaine into the U.S.

DEFENSE ATTORNEY: Excuse me. We will object to that.

THE COURT: I will sustain it as to conclusions drawn.

After the trial court sustained his objection, Ivatury failed to request an instruction to disregard and failed to move for a mistrial. Ivatury received all the relief that he requested. Usually the trial court's instruction to disregard cures any error caused by the admission of improper testimony, except in extreme cases where it appears that the state clearly used the question or evidence to inflame the minds of the jurors and its character suggests the impossibility of withdrawing the impression produced on their minds. *Coe v. State*, 683 S.W.2d 431, 436 (Tex.Crim.App.1984). Since Ivatury failed to ask for an instruction to disregard or move for mistrial and the objectionable evidence was a nonresponsive answer rather than a question intended to inflame the minds of the jurors, we overrule his seventh point of error.

### Earlier Murder Plot

█ In his eighth point of error, Ivatury argues that the trial court committed reversible error when it allowed the admission of testimony as to his involvement in an earlier murder plot against a customs agent. Specifically, Ivatury complains about Agent Fahey's testimony as to the following conversation he overheard between Ivatury and Villarma:

Q STATE'S ATTORNEY: What did you hear after that?

A AGENT FAHEY: After that, Henry basically asked him what he wanted and Shaker responded, "that I need to get someone taken care of." And Henry asked, "Who is this person?" and Shaker said, "It is a Customs agent." And Henry says—well, the exact words: Do you know who you're ... fuckin' with, "and Shaker said, "Yes, this is no big deal. I have done it before."

Ivatury objected to this testimony as an extraneous offense and was overruled by the court. Subsequently, Villarma began to testify as to this same conversation, Ivatury made the same objection, and the court again overruled the objection. Villarma continued to testify as follows:

Q STATE'S ATTORNEY: What did you say?

A VILLARMA: He said, "Yes." And I said, "Do you know what you're doing?" and he said, "Yes." And he says, "I have done this before—

At this point, the court reversed itself and decided to sustain Ivatury's objection as to this last answer by Villarma. However, Ivatury then failed to request an instruction to disregard and failed to move for a mistrial. Ivatury received all the relief he requested. As noted earlier, an instruction to disregard cures any error caused by the admission of improper testimony. *Coe*, 683 S.W.2d at 436. Further, Ivatury's statements evidence his intent and serve to refute his claim of entrapment. Because Ivatury failed to properly pursue his objection and the evidence tends to show his intent and refutes his claim of entrapment, the trial court did not commit reversible error when it allowed the admission of this testimony. We overrule Ivatury's eighth point of error. We affirm the judgment of the trial court.