**Ben SHEFFIELD**

v.

**The STATE of Texas.**

**No. 12–90–00153–CR.**

Court of Appeals of Texas, Tyler.

Sept. 18, 1992.

Rehearing Denied Oct. 29, 1992.

Clifton Holmes, Longview, for appellant.

Rob Foster, Ebb B. Mobley, Longview, for appellee.

ONION,[1] Presiding Judge (Retired).

Appellant appeals his conviction for criminal solicitation of capital murder. *See* TEX.PENAL CODE ANN. § 15.02 (Vernon 1974), and § 19.03(a)(3) (Vernon 1989). After the jury found Appellant guilty, they assessed his punishment at imprisonment for life.

Appellant advances eight points of error. At the outset, we are confronted with Appellant's fourth point of error challenging

---

1. The panel before whom this cause was submitted consisted of John F. Onion, Jr., Presiding Judge (Retired), Court of Criminal Appeals, Stephen F. Preslar, Chief Justice (Retired), El Paso Court of Appeals, and Raleigh Brown, Justice (Retired), Eastland Court of Appeals, sitting by assignment of the Chief Justice of the Texas Supreme Court pursuant to TEX.GOV'T CODE ANN. § 74.003(b) (Vernon 1988).

the sufficiency of the evidence to sustain his conviction. Appellant argues that the trial court erred in overruling his motion for an instructed verdict because the evidence was insufficient to corroborate the testimony of Titus McKee in light of the provisions of TEX.CODE CRIM.PROC.ANN. art. 38.14 (Vernon 1979) and TEX.PENAL CODE ANN. § 15.03(b) (Vernon 1974). We sustain the point of error, reverse the judgment of conviction and order an acquittal.

The State's evidence at the guilt/innocence phase of the bifurcated trial was elicited from five witnesses, (1) Dr. Ted. L. Rankin, a pathologist, (2) Larry Smith, Captain of the Criminal Investigation Division, Gregg County Sheriff's Office at the time of the alleged offense and subsequent investigation, (3) Titus McKee, the self-admitted killer of Wayne Hutson, (4) Kevin Settle, McKee's attorney, and (5) Gene Anderson, a Gregg County Deputy Sheriff at the time of the investigation. The State's principal witnesses were Smith and McKee. The Appellant rested with the State and offered no evidence.

The body of Wayne Hutson was found in his van off the Seven Pines Road near an oil lease in northern Gregg County on the morning of September 18, 1985. Hutson appeared to have been shot in the chest and his body bore bruises and lacerations. Hutson's watch and part of a wallet were found at the scene.

Dr. Rankin performed an autopsy on the deceased and determined that the cause of death was a gunshot wound to the chest. The doctor described the bruises and lacerations found on the body and expressed his opinion as to how they might have been inflicted.

Captain Larry Smith detailed at some length his investigation of the murder. In trying to determine motive and locate a suspect, Smith interviewed Bennie Hutson, the deceased's wife, and her sister, Audrey Meador, both of whom were employed at the Oil Bowl Lanes, as well as other relatives and friends. Workers at the Texas Eastman Company where the deceased was employed were also contacted. Smith had no suspects until late November 1985,

when he learned from the district attorney's office that attorney Steve Kattner had a client in jail who had information about the murder of Hutson. That individual was Ben Sheffield, the Appellant, who was confined on an unrelated charge of delivery of a controlled substance. A "deal" was made between the then district attorney and Appellant and his counsel as to the pending charge and a parole violation, provided that Appellant was not involved in the Hutson murder. On December 4, 1985, Appellant gave a statement to Smith that was generally exculpatory, but implicated Titus McKee in the Hutson murder. A portion of the statement was offered by the State without objection. The balance of the statement was offered by the Appellant under the rule of optional completeness. See TEX.R.CRIM.EVID. 107 (Vernon Pamph.1992). The entire statement was before the jury. See "Appendix A." In his statement, Appellant acknowledged that he had known Titus McKee for about two years, having met McKee when McKee was looking for drugs; that Appellant sold dilaudid capsules (synthetic heroin) to McKee on credit; and that later McKee, his wife and child moved into Appellant's apartment for a period of time. Appellant acknowledged that in early September 1985, he was still selling dilaudid capsules on a regular basis to McKee; that McKee followed him to the Oil Bowl Lanes and into the Cotton Bowl Club there; and that McKee, during this time, began to talk of committing robberies. Appellant stated that on the night of September 17, 1985, McKee appeared at his house to purchase dilaudid caps, using a gun in trade for the drugs; that McKee displayed a billfold with the picture of a man whom Appellant had seen at the Oil Bowl Lanes; and that the next day, McKee returned and confessed that he was involved in the murder, but insisted that the other "dude" with him had done the shooting. Appellant revealed that he refused to lend McKee money to give to the other man so he could leave town.

Smith revealed that Appellant led him to a wooden shed and gave him "a .357 magnum" wrapped in a towel. Appellant stated that McKee had given him the gun in

exchange for dilaudids. Smith indicated that this was not the weapon that had fired the fatal shot. A warrant of arrest was issued for McKee.

Sometime in December 1985, attorney Kattner indicated to Smith that he had another unnamed client who might be involved in the Hutson murder. Thereafter, Smith visited Morris Phinney in jail after receiving a note from Phinney. He decided that Phinney, incarcerated on unrelated charges, was the client. Smith took Phinney's shoes and found similarities between them and the plaster of paris casts that had been taken at the murder scene. Phinney later gave a written statement. With Phinney's help, the shotgun used to strike Hutson was recovered.

In hopes of obtaining additional information, Captain Smith placed the Appellant in the same area of the jail in which McKee was confined. On January 2, 1986, the Appellant testified for the State at McKee's examining trial. Appellant's bail was reduced and he was released with instructions from Captain Smith to keep his ears and eyes open and to report immediately if he obtained any information.

On May 1, 1986, Captain Smith obtained a written statement from McKee implicating Appellant, Audrey Meador, Morris Phinney, and Terry Shannon. On May 7, 1986, Smith arranged to have McKee telephone the Appellant from the jail. Appellant was reached at his brother's (Leo Sheffield) store. The recorded conversation was introduced without objection. *See* "Appendix B."

Captain Smith related that the telephone conversation took place at 2:45 p.m. Smith stated that Gene Anderson, a deputy sheriff, reported to him that the Appellant was at the Oil Bowl Lanes at 3:10 p.m.; Leo Sheffield's store was 3.4 miles from the bowling lanes and that it takes nine minutes to drive the distance between the two locations.

Smith also testified that after taking McKee's statement, he took statements from McKee's wife, Gail, and a John Easley. At Smith's suggestion, Gail McKee contacted Audrey Meador. Gail McKee received money from Meador on several occasions.

Titus McKee, who was serving a life sentence for his part in the murder, was the State's principal witness. McKee testified that he came to the Longview area from Freeport in the summer of 1984. His purpose was to get off of drugs (mainly heroin). While seeking heroin on Sabine Street in Longview, McKee encountered the Appellant. McKee did not acquire any heroin at that time, but he obtained Appellant's address. A few days later, McKee got a cap of dilaudid from the Appellant and split it with his wife, who was also using drugs. Shortly thereafter, McKee, his wife and child moved into Appellant's apartment where they stayed for a month and a half. McKee and Appellant started going to various clubs together because Appellant thought it best because he was black and McKee was white. McKee described Appellant as pursuing his business—"hustling," meaning "making money any way you can."

McKee stated that he left Longview and worked for a construction company in Louisiana. Thereafter, he spent ninety days in the Brazoria County Jail. He returned to Longview in August of 1985. McKee renewed his acquaintanceship with the Appellant. As McKee recalled, Appellant asked him if he wanted to make some "big money," but that Appellant did not reveal what he wanted McKee to do. Two or three days later, Appellant took McKee to the Oil Bowl Lanes in Longview. On the way, Appellant told McKee that McKee could make $6,000 for driving a car, but again Appellant did not reveal the purpose. At the bowling lanes, McKee saw Appellant talking to Audrey Meador. The next day, Appellant informed McKee that Meador wanted Wayne Hutson killed. At the Oil Bowl Lanes Appellant introduced McKee to Meador and walked off. McKee acknowledged to Meador that he knew what was "going on," and assured her that he would keep his mouth shut. McKee heard an "excuse" from Meador for killing Hutson, and remembered that Meador had told him a divorce was imminent, and that if "it" did

not happen before the divorce "it was off."[2] After that meeting, McKee knew what Appellant and Meador wanted him to do. McKee understood that he was to drop Appellant off and then pick him up after the crime, and he had the impression that Meador was to pay the money.

Several days later, Appellant took McKee to the Oil Bowl Lanes where Meador worked. Meador then took McKee and showed him two different houses. On another occasion, McKee met her at the Pine Tree School. He was able to observe Hutson's van, but did not get a good view of Hutson. Meador gave him a picture of Hutson and told him to show it to the Appellant. McKee admitted that Meador was giving him twenty, forty, or sixty dollars a day during this time. Appellant was staying in the background. McKee was informed that detectives had been asking questions about the Appellant's presence at the Oil Bowl Lanes and the club there.

Later, Appellant told McKee that he (Appellant) was "hot" and that he had to "pull back." When McKee declined to kill Hutson, Appellant offered to find someone else if McKee would show him where to go. Being afraid of being taken "care of too," McKee volunteered to find someone himself. McKee then recruited Morris Phinney, a methamphetamine dealer whom McKee had known for a day or two. McKee told Phinney that the job involved keeping Hutson away from a telephone for a period of time. He agreed to pay Phinney five hundred dollars.

On September 17, 1985, McKee related that Appellant gave him a gun, which he thought was a ".44," and told him "it was time"; that the "lady" had called and said Hutson was at her house. McKee went to Phinney's apartment where Phinney insisted that his girl friend, Terry Shannon, go along "to make sure there wasn't nothing going down." McKee agreed, as it was his plan at that time to keep Hutson away

from a telephone, inform Meador that the deed was done, and allow her time to do some checking by telephone. Shannon drove her car and Phinney and McKee went together in another vehicle. At Meador's apartment, Phinney took the pistol McKee offered him, then went into the apartment and returned with Hutson, who was forced into his own van. Shannon and McKee followed Hutson's van in separate vehicles until it pulled off the road near an oil lease. When Phinney refused to stay with Hutson until McKee returned, McKee told Phinney to knock Hutson unconscious. Phinney tried to do so unsuccessfully with a shotgun. When Phinney went to get an extension cord out of Shannon's car, Hutson fled. Phinney gave chase, caught Hutson, and returned him to the van. In the interim, Shannon left the scene. McKee revealed that he got into an argument with Hutson who was tied to a chair in the van and the pistol went off, striking Hutson.

McKee returned an angry Phinney to his apartment. Later, McKee drove around trying to find a place to dispose of the pistol. As he drove, McKee began throwing the bullets away, but one bullet fell back into the car as he was doing this. When he reached for the bullet, McKee found a part of Hutson's wallet, which Phinney had taken. McKee then drove to the Appellant's apartment. McKee knew Appellant would be at a poker game, and he requested that Appellant's wife call him there. When Appellant arrived home, McKee gave him the gun and Appellant hid it in the ceiling. McKee showed Hutson's wallet to Appellant. Appellant telephoned Meador and then paid McKee three thousand dollars in cash. McKee then obtained five dilaudid capsules from Appellant, paying him five hundred dollars for those and three others he had gotten on credit.

McKee testified that on a later occasion, he went with Appellant to a Wal–Mart

---

2. The record shows that Meador's sister, Bennie, was Hutson's wife. Meador's motive was not well developed. Captain Larry Smith testified that at one point in his investigation, he had written Charles Malone in the Insurance Benefits Division of Texas Eastman Company, that it

did not appear that any family members were involved in Hutson's murder. It appears that the company had an insurance policy on Hutson's life. *See Meador v. State,* 811 S.W.2d 612, 614 (Tex.App.—Tyler 1989), *aff'd,* 812 S.W.2d 330 (Tex.Cr.App.1991).

store where Meador gave them eight hundred dollars which they split evenly.[3]

After his arrest in December of 1985, McKee was given a copy of Appellant's earlier statement. At his examining trial on January 2, 1986, McKee heard Appellant testify against him. McKee did not give his written statement admitting his part in Hutson's murder until May 1, 1986. Thereafter, on May 7, 1986, McKee, working with Captain Smith, engaged Appellant in a police-recorded conversation in an attempt to prove that Appellant was involved.

At the conclusion of McKee's direct examination, his written statement was admitted into evidence over the objections of "bolstering" and "hearsay." The recorded telephone conversation was also admitted into evidence.

The attorney-client privilege having been waived, Kevin Settle, McKee's court-appointed counsel, testified that he represented McKee at the time McKee gave his written statement on May 1, 1986. Over an objection of hearsay, Settle was permitted to testify that the statement was substantially what McKee had told him.

Gene Anderson, a Gregg County Deputy Sheriff at the time of the investigation, testified that he was at the Oil Bowl Lanes on May 7, 1986, to determine whether Audrey Meador was at that location. When he entered the establishment at 3:10 p.m. he saw the Appellant there. Appellant asked Deputy Anderson about Captain Smith, and then left shortly thereafter. Anderson never saw Meador at the Oil Bowl Lanes. The State offered this evidence to establish that shortly after the tape recorded conversation between McKee and the Appellant, that Appellant was at the Oil Bowl Lanes, a place which the evidence showed he frequented.

The trial court charged the jury that Titus McKee was an accomplice witness as a matter of law, and in accordance with TEX.CODE CRIM.PROC.ANN. art. 38.14 (Vernon 1979), instructed the jury that Appellant could not be convicted upon McKee's testi-

mony unless it believed the testimony to be true and it was corroborated by other evidence tending to connect the Appellant with the offense charged. In addition, the trial court separately charged, in accordance with TEX.PENAL CODE ANN. § 15.03(b) (Vernon 1974), that Appellant could not be convicted of criminal solicitation on the uncorroborated testimony of a person allegedly solicited unless the solicitation was made under circumstances strongly corroborative of both the solicitation and the actor's intent that the other person act on the solicitation. The above portions of the charge as to corroboration were also incorporated in the application paragraph of the court's charge. The State made no objection to the charge, nor did it request any special charge.

In his fourth point of error, Appellant contends that there was insufficient evidence to convict him because McKee's testimony was not corroborated under the provisions of TEX.CODE CRIM.PROC.ANN. art. 38.14 (Vernon 1979) and TEX.PENAL CODE ANN. § 15.03(b) (Vernon 1974).

Section 15.03(a) and (b) of the TEXAS PENAL CODE provides:

(a) A person commits an offense if, with intent that a capital felony or felony of the first degree be committed, he requests, commands, or attempts to induce another to engage in specific conduct that, under the circumstances surrounding his conduct as the actor believe them to be, would constitute the felony or made the other a party to its commission.

(b) A person may not be convicted under this section on the uncorroborated testimony of the person allegedly solicited and unless the solicitation is made under circumstances strongly corroborative of both the solicitation itself and the actor's intent that the other person act on the solicitation.

TEX.PENAL CODE ANN. § 15.03 (Vernon 1974).

---

**3.** The record reflects other payments by Meador to McKee personally, McKee's wife, and others. Appellant was not involved in these payments.

The indictment, in pertinent part, alleges that Appellant on or about September 17, 1985, did then and there:

> intentionally, with intent that a capital felony be committed, namely, capital murder of an individual, WAYNE HUTSON, request, command and attempt to induce TITUS McKEE to engage in specific conduct that, under the circumstances surrounding the conduct of TITUS McKEE as the said BEN SHEFFIELD believed them to be, would constitute such capital murder, and such specific conduct was as follows, to-wit: the said BEN SHEFFIELD did request, command and attempt to induce the said TITUS McKEE to murder WAYNE HUTSON for remuneration and promise of remuneration, to-wit: money,....

■ To support a conviction for criminal solicitation pursuant to section 15.03, the evidence must establish that the defendant acted knowingly and with the specific intent that a capital murder or a felony of the first degree be committed. *Richardson v. State*, 681 S.W.2d 683, 687 (Tex. App.—Houston [14th Dist.] 1984), *aff'd*, 700 S.W.2d 591 (Tex.Cr.App.1985) (en banc). Although the statute requires conduct of an active and positive nature, no requirement exists that the offense occur at the beginning of an actor's involvement in a criminal enterprise. *Schwenk v. State*, 733 S.W.2d 142, 147 (Tex.Cr.App.1981) (Panel op. on rehearing). The statute disallows a conviction for criminal solicitation based solely on the uncorroborated testimony of the person allegedly solicited. The circumstances surrounding the solicitation must strongly corroborate both the solicitation itself and the actor's intent that the other person act on the solicitation. *Saunders v. State*, 572 S.W.2d 944, 954–55 (Tex. Cr.App.1978) (Panel op.); *Ivatury v. State*, 792 S.W.2d 845, 849 (Tex.App.—Dallas 1990, pet. ref'd); *Bell v. State*, 768 S.W.2d 790, 793 (Tex.App.—Houston [14th Dist.] 1989, pet. ref'd). It has been said that section 15.03(b) is analogous to article 38.14 and should be read in conjunction with it. *Richardson*, 700 S.W.2d at 592; *see also Holladay v. State*, 709 S.W.2d 194, 201 (Tex.Cr.App.1986) (en banc). The test used to evaluate the corroborating evidence is to eliminate from consideration the testimony of the accomplice witness and determine if there is other evidence which tends to connect the defendant with the crime. The corroborating evidence need not directly link the defendant with the crime or be sufficient in itself to establish guilt. *Richardson*, 700 S.W.2d at 594. Although the use of the word "strongly" in section 15.-03(b) seems to suggest a different standard, the Court of Criminal Appeals has held that "strongly corroborative" does not indicate a different standard but only reemphasizes the need for an additional safeguard, that being that the corroboration must go to both the solicitation and the solicitor's intent. *Id.; Bell*, 768 S.W.2d at 793.

■ The difficulty with the *Richardson–Holladay* approach is that there is not always an accomplice witness in every criminal solicitation case. *See Varvaro v. State*, 772 S.W.2d 140 (Tex.App.—Tyler 1988, pet. ref'd). One is not an accomplice witness who cannot be prosecuted for the offense with which the accused is charged. *Kunkle v. State*, 771 S.W.2d 435, 439 (Tex. Cr.App.1986), *cert. denied*, 492 U.S. 925, 109 S.Ct. 3259, 106 L.Ed.2d 604 (1989). If a State's witness has no complicity in the offense for which an accused is on trial, his testimony is not that of an accomplice witness whatever may have been his complicity with the accused in the commission of other crimes. *Gamez v. State*, 737 S.W.2d 315, 322 (Tex.Cr.App.1987); *Rushing v. State*, 813 S.W.2d 646, 648–49 (Tex.App.— Houston [14th Dist.] 1991, pet. ref'd). Moreover, a witness is not deemed an accomplice witness because he knew of the crime but failed to disclose it or even concealed it. *Gamez*, 737 S.W.2d at 322. When there is no accomplice witness in a criminal solicitation case, it would be strange to say that section 15.03(b) must be read in conjunction with article 38.14. Given the nature of the offense of criminal solicitation, *see* SETH SEARCY & JAMES PATTERSON, *Practice Commentary*, TEX.PENAL CODE ANN. art. 15.03 (Vernon 1974), the elements of the offense, *see* BRANCH'S

ANN.PENAL STATUTES, § 15.03 at 646 (3rd ed. 1974), and the time at which the offense is completed, the person solicited may seldom be an accomplice witness, regardless of his complicity with the accused in other crimes. *Harris v. State,* 738 S.W.2d 207, 215 (Tex. Cr.App.1986).[3] In a prosecution for criminal solicitation, the corroboration required by section 15.03(b) is applicable whether or not the person allegedly solicited is an accomplice witness. *Varvaro,* 772 S.W.2d at 142.

 Under the circumstances of the instant case, a question of whether McKee was an accomplice witness may well be raised. This is a matter of small moment in light of the trial court's jury instructions to which there was no objection by the State. In accordance with the *Benson–Boozer* line of cases, the sufficiency of the evidence must be measured against the charge that was given to the jury. *Boozer v. State,* 717 S.W.2d 608, 610 (Tex.Cr.App. 1984); *Benson v. State,* 661 S.W.2d 708, 715 (Tex.Cr.App.1982), *cert. denied,* 467 U.S. 1219, 104 S.Ct. 2667, 81 L.Ed.2d 372 (1984); *see also Nickerson v. State,* 782 S.W.2d 887 (Tex.Cr.App.1990); *Marras v. State,* 741 S.W.2d 395 (Tex.Cr.App.1987); *Ortega v. State,* 668 S.W.2d 701 (Tex.Cr. App.1983). In deciding whether the evidence was sufficient to support Appellant's conviction, we must determine whether the State proved the allegations in the indictment as set forth in the trial court's jury charge. *Warren v. State,* 810 S.W.2d 202, 203 (Tex.Cr.App.1991). · By not objecting to the charge, the State unnecessarily assumed the burden of proving the allegations of the indictment as incorporated into the court's charge. *Id.* at 204. If there is a variance between the allegations and the proof, the evidence may be insufficient to support the conviction. An appellate court must "look to the charge to determine whether the part at issue is one which 'authorizes a conviction.'" *Arceneaux v. State,* 803 S.W.2d 267, 271 (Tex.Cr.App. 1990). If the answer to that question is in the affirmative, the portion of the charge is

not surplusage, and the State assumes the burden of proving the unnecessary allegation. *Id.*

 In light of the jury charge, we must determine whether there was corroboration of McKee's testimony under both article 38.14 *and* section 15.03(b). There will be, of necessity, some overlapping between the two statutes in our discussion. In *Edwards v. State,* 427 S.W.2d 629 (Tex. Cr.App.1968), the court wrote:

> The test as to the sufficiency of the corroboration is to eliminate from consideration the evidence of the accomplice witness and then to examine the evidence of other witnesses with the view to ascertain if there be inculpatory evidence, that is evidence of incriminating character, to connect the defendant with the commission of the offense.

*Edwards* at 632.

 McKee's testimony made out a complete case against Appellant. Standing alone, his testimony was not enough to sustain the conviction. McKee's testimony required corroboration. The State relies upon Appellant's written statement (Appendix A) and the recorded telephone conversation between Appellant and McKee (Appendix B) to meet the required corroboration. Appellant's statement was generally exculpatory and offered no direct evidence of corroboration. Appellant corroborated the facts that: he and McKee had known each other for about two years; for a period of time McKee, his wife, and child had lived at Appellant's apartment, and; he had sold drugs to McKee for cash, trade, or on credit. A mere showing of being associates or that the accused and the accomplice witness were together before or shortly after the commission of the offense may not be sufficient corroboration. *Cherb v. State,* 472 S.W.2d 273, 280 (Tex.Cr.App. 1971); *see also Paulus v. State,* 633 S.W.2d 827, 846 (Tex.Cr.App.1982). It must be coupled with other circumstances. *Id.* at 846. Appellant's statement confirmed

---

**3.** Under the former penal code, an accessory after the fact was an accomplice witness. This is no longer true under the 1974 PENAL CODE.

*Harris,* 738 S.W.2d at 215; *Easter v. State,* 536 S.W.2d 223, 228 (Tex.Cr.App.1976).

McKee's testimony that Appellant knew Audrey Meador, for whom he had taken horse racing bets, and that McKee had first gone to the Oil Bowl Lanes with Appellant. Evidence which merely goes to show motive or opportunity of the accused to commit the crime is insufficient to corroborate an accomplice witness. There must be other evidence independent of that of the accomplice witness. *Paulus*, 633 S.W.2d at 846. Appellant's statement also corroborated the fact that McKee came to Appellant's apartment or house and left the gun that McKee claimed was used to kill Hutson. The charged offense was criminal solicitation, not murder. An accomplice witness or the person allegedly solicited may state any number of facts that are corroborated by evidence of other witnesses; still if the facts thus corroborated do not tend to connect the accused with the crime or show circumstances strongly corroborating both the making of the solicitation and that its making was in earnest, the requirements of both article 38.14 and section 15.03(b) are not met. *See Paulus*, 633 S.W.2d at 844; *Ivatury v. State*, 792 S.W.2d 845, 849 (Tex.App.—Dallas 1990, pet. ref'd).

▮ The recorded telephone conversation between McKee and Appellant, except for the remarks about the rings and the bail bond, has been described as "unintelligible and meaningless—utter nonsense." *Meador v. State*, 811 S.W.2d 612, 624 n. 24 (Tex.App.—Tyler 1989), *aff'd*, 812 S.W.2d 330 (Tex.Cr.App.1991); *see also* the discussion of the same telephone conversation in a different context: *Meador*, 812 S.W.2d at 334. An examination of the conversation does not reflect circumstances that could be regarded as furnishing the necessary corroboration. The State did offer evidence that Appellant was seen at the Oil Bowl Lanes shortly after the telephone conversation. This was a place that Appellant frequented and he was not seen with Audrey Meador. This is not enough standing alone to furnish the necessary corroboration. Evidence which does no more than point the finger of suspicion towards the accused is insufficient to meet the test of corroboration. *Paulus*, 633 S.W.2d at 844.

The facts in the instant case are a far cry from the facts in cases where the evidence has been held sufficient to support corroboration. *See Schwenk*, 733 S.W.2d at 146–47; *Richardson*, 700 S.W.2d at 595; *Ivatury*, 792 S.W.2d at 849–50; *Varvaro*, 772 S.W.2d at 143–44; *Bell*, 768 S.W.2d at 796; *Chennault v. State*, 667 S.W.2d 299, 301–02 (Tex.App.—Dallas 1984, writ ref'd).

▮ The standard for reviewing the sufficiency of the evidence is whether, viewing the evidence in the light most favorable to the verdict, any rational trier of fact could have found all the essential elements of the offense charged beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 n. 12, 99 S.Ct. 2781, 2789 n. 12, 61 L.Ed.2d 560 (1979); *Butler v. State*, 769 S.W.2d 234, 239 (Tex.Cr.App. 1989). The standard for review is the same in both direct and circumstantial evidence cases. *Herndon v. State*, 787 S.W.2d 408, 409 (Tex.Cr.App.1990); *Chambers v. State*, 711 S.W.2d 240, 244–45 (Tex.Cr.App.1986). Sufficiency of the evidence is a question of law. The appellate court may not sit as a thirteenth juror and disregard or reweigh the evidence. *Moreno v. State*, 755 S.W.2d 866, 867 (Tex.Cr.App.1988).

In viewing the evidence in the light most favorable to the jury's verdict, we conclude that a rational trier of fact could not have found sufficient corroboration to satisfy the requirements of article 38.14 *and* section 15.03(b) as submitted to the jury in the court's charge. Appellant's fourth point of error is sustained.

In view of our disposition of the fourth point of error, we do not deem it necessary to respond to Appellant's other points of error. The judgment of the trial court is reversed and a judgment of acquittal is ordered. *Burks v. United States*, 437 U.S. 1, 18, 98 S.Ct. 2141, 2151, 57 L.Ed.2d 1 (1978); *Ex parte Reynolds*, 588 S.W.2d 900, 904 (Tex.Cr.App.1979).

## APPENDIX A

Omitting the formal parts of the statement, the Appellant's statement of December 4, 1985 reads:

My name is Ben Andrew Sheffield. I am forty-one years of age. I reside at 213A Hoskins Street in Longview, Gregg County, Texas. I graduated from Mayflower High School in 1962. I can read, write and understand the English language.

Approximately two years ago I was down on Sabine Street in Longview, Texas at a guy named 'Snakes' house. I know the guy only as 'Snake' and he lived in front of the store that is next to 'Ticks' Bar–B–Que on Sabine Street. I had stopped at 'Snakes' while I was out just driving around. There was a white girl sitting on 'Snakes' porch. I was getting out of the car and a white guy walked up to me and introduced himself as Titus. We began carrying on a conversation and Titus told me that was his wife on 'Snakes' porch and that he was looking for 'Snake.' I could tell that Titus was looking for drugs. We began "beating around the bush" talking about drugs because I didn't know him and he didn't know me. I finally told Titus where I lived and I told him to come by sometime. He told me that they were sleeping in the car then and didn't have a place to stay. I left after talking to him for a few minutes. I was living at the Treehouse Apartments in Longview, Texas, at 600 West Avalon, Apartments [sic] Number 283. A few days later Titus, Gail (his wife), and their little boy named Wesley came by my apartment. Titus knew that I was dealing in Dilaudid. Titus and Gail both used Heroin. Titus was talking about wanting some "caps." All that I had at the time was Dilaudid. Titus didn't have any money and he wanted some on credit. I gave Titus two Dilaudids on credit. Titus, Gail and Wesley began at that time to hang around my apartment alot [sic]. They ended up living with Debra and me for a month or two until the manager of the Apartments started complaining and I told them Titus that the manager was getting on me about them and that he had to move.

Before Titus moved in with me he had 'soaked' or pawned a shotgun and pistol to Tom Robertson who lives in Lakeport behind the Airport. Tom told me that the guns were stolen later and that he thought that Titus had stolen them back. Titus also had another pistol that he kept in his car.

I have never known 'Titus' last name but he is a white male, approximately in his early to mid thirties, approximately 5'9" tall, stocky built, and had brown collar length hair. Titus told me that he had worked in Freeport and that he had been working for Joe at a used car lot across from El Chico's on Highway 80 in Longview. Gail was working there also. Gail was working for Charlie Vail at the Little Chain Grocery Store on Hwy. 80 also.

Gail is a white female approximately twenty-five years old, approximately 5'9" tall, medium build, and has long brown hair.

Wesley is a white male, approximately four years old, and has brown hair.

After Titus, Gail and Wesley moved out I have seen them on a regular basis since.

Approximately three months ago (sometime around the first part of September) Titus came to my apartment on Joskins to buy some Dilaudid. He had been buying Dilaudid from me on a regular basis. He would pay cash for it, trade something for it and sometimes he would buy it on credit. Titus and Gail followed me to the Oil Bowls Lanes. We shot a couple of games of pool in the game room and then I went into the club. As I was going into the club, Titus was letting Wesley drive a little car in the game room. A few minutes later Titus came into the club where I was. I was sitting at the bar and I gave him five dollars. Titus had asked me on several occasions if I knew somebody with a lot of money that he could "knock off" or a poker game that he could rob. He said, "just any place that I can take off some money." He told me that he was thinking about robbing the guy that ran the 50's Club on Highway 80. I told him that the guy and I were pretty good friends and that, wouldn't be too cool.

After this day Titus began going to the Cotton Bowl Club at the Oil Bowl Lanes regularly to shoot pool and drink beer. I saw Titus in the Cotton Bowl Club after he had followed me out there and he pointed out several guys to me and asked me if they had money. I told him that I didn't know what they had in their pockets. A few days after this Titus asked me if I could get rid of some jewelry if he got some. I told him that I probably could. Then Titus told me that he had spotted some. He didn't tell me at this time who had it, but a few days later Titus told me that he had spotted a dude in the Cotton Bowl Club with some jewelry on. He told me that he drove a van and looked like he had some money. Titus told me that if he would have had somebody to drive that night that he could have got him then because he followed him out on 1845. He told me that he had been watching him and following him and asked me if I would drive my car while he robbed him. I told him that I wouldn't. He then told me that he was going to try and fine somebody to help him out. At this time I didn't know who the man was that he was talking about robbing.

About a week later on a Monday or Tuesday night I was at a poker game at Nora's by Citizen's Funeral Home in Longview. At around midnight Debra called me and told me that Titus was at our apartment and that he wanted to see me. I asked her what he wanted. She told me that he wouldn't talk to her that he wanted to talk to me. I told her to tell him that I would be there in a few minutes. I went home and Titus was sitting on the couch. Titus got up and looked real nervous and shakey. Debra told me that Titus had given her a pistol wrapped in a towel. Debra had already put the gun up. Titus wanted some Dilaudid. He got five Dilaudid. Titus paid for three of them and gave me one hundred and eighty dollars cash and I kept the pistol for the other two. We walked into the bathroom because Titus didn't want to talk in front of Debra. Titus

had a brown billfold in his hand and he dropped it on the floor. He picked it up and I asked him what it was. He said "It's done, this is the man." I saw a card in the billfold with some Texas Eastman writing on it and a picture. The picture was of a white man that was balding in front. I recognized this picture as being a guy that I has seen in the Cotton Bowl Club talking to Audrey before. Audrey is a lady that works at the bowling alley that I have taken some horseracing bets for before. She has dark black hair and is approximately in her late fortys. I said to Titus, "I guess you done did something." He said, "Yeah." Titus left then and I went back to the poker game. The next day Titus came over and told me that the pistol that he had left at my house had been shot once the night the guy was killed. I asked him where the other bullets were and he said that he got rid of them. Titus told me that there was another dude with him and that they had ran the guy off the road, beat him up so bad that he couldn't stand it, that they had bent the van, and tied the guy up. He also said that he wiped all of his fingerprints off the van and hadn't left anything out there. Titus told me that they tied the guy up and that he had gotten loose and they shot him. He said that the other dude shot him. He told me that the guy had a bunch of travelers checks and that they also go a diamond ring from him. Titus said that he told the other dude not to wear the ring and that if he was going to get rid of it to take the stones out of it. He said that they got some money from him but the other dude kept it. Titus said that the man had a bunch of keys too. Titus told me that he threw the keys away. Titus also told me that he burned up his shoes and clothes. Titus said that the Dude that was with him followed him from the Little Chain Grocery to his house in Hallsville and asked him for two or three hundred dollars to get out of town. Titus came to me to borrow the money. Titus told me that if he couldn't get the money that he was going to have to do something to the

guy. I didn't give him any money. I later saw Titus at the Little Chain and he told me that the dude had left town.

I was later arrested for Delivery of a controlled Substance and have been in the Gregg county Jail for the past two months. I contacted my attorney about this information and my attorney contacted the District Attorney's Office.

I have since taken Larry R. Smith and Russell Pott's to the location in which the pistol was hidden that Titus gave to Debra the night that she called me at the poker game.

I have given this statement to Captain Larry R. Smith and Russell Potts of my own free will. This statement is true and correct to the best of my knowledge. I have not been threatened in anyway to make this statement.

## APPENDIX B

The recorded telephone conversation between Appellant and Titus McKee of May, 7, 1986 follows:

VOICE: Hello.

OPERATOR: Collect call from Titus McKee. Will you accept?

VOICE: Yes, I'll accept.

TITUS: Hello.

LEO: Hey.

TITUS: How's it going?

LEO: Okay. You all right?

TITUS: Yeah, kinda setting. You got Ben's phone number?

LEO: Ben?

TITUS: Yeah.

LEO: Ah. Yeah. You want to talk to him?

TITUS: Yeah, I need to.

LEO: Just a minute. Ben (calling). Believe it or not, he's just fixing to pull off, Titus. Just fixing to pull off out there outside there. What's going on?

TITUS: Nothing much. Been a long set.

LEO: Shit, I heard it.

TITUS: Been sitting here a long time.

LEO: You ain't found out nothing yet or worked out nothing, got anything concrete or—?

TITUS: No, I just waiting to come to Court.

BEN: Hello.

TITUS: Say.

BEN: Hey.

TITUS: What's going on?

BEN: Ain't nothing to it.

TITUS: Wondering about Gail's rings.

BEN: Huh?

TITUS: Wondering about Gail's rings.

BEN: What about 'em?

TITUS: Yeah.

BEN: I don't know. I guess Dee still got 'em, I guess.

TITUS: Where can I get 'em from?

BEN: Huh?

TITUS: When can I get 'em from her?

BEN: When can you get 'em from 'em her?

TITUS: Yeah. And how?

BEN: How much was it in there. I don't even know how much was it.

TITUS: That's already paid.

BEN: What's already paid?

TITUS: For them rings.

BEN: Oh, it is?

TITUS: Yeah.

BEN: Do Dee know it's paid or what?

TITUS: Yeah, that's—.

BEN: Huh?

TITUS: Yeah, I brought that eleven hundred over there that night for all that.

BEN: Well, I don't know. I can see Dee and see if she's got 'em. I guess I guess she's still got 'em. I don't even know. I ain't even paid no 'tention.

TITUS: Say, you don't think that somebody will make my bond, do you?

BEN: How much is your bond?

TITUS: Well, it's a hundred thousand right now.

BEN: Can't you get a lawyer and get it down?

TITUS: Well, I don't know. I just wanted—I don't know how much I can get yet. I ain't—.

BEN: I'm talking about get a lawyer and get the bond down.

TITUS: Mine keeps on saying something about he won't do nothing 'til he

knows I can get it—get some money to get it down.

BEN: Who is the lawyer?

TITUS: Kevin Settles.

BEN: Kevin Settles.

TITUS: Think that lady do anything?

BEN: I don't know. I can check—you know.

TITUS: Yeah. I tried to call her a little while ago and couldn't get her.

BEN: I can check.

TITUS: All right.

BEN: I can check. Where Gail at?

TITUS: Well, she's off somewhere right now. She's scared.

BEN: She ain't come to visit?

TITUS: Huh?

BEN: She visit you?

TITUS: Not much. Too scared.

BEN: Uh-huh. I'll check on them rings and that other.

TITUS: Man, I don't understand this, you know.

BEN: I don't know what's going on neither.

TITUS: I don't know, you know. What did you do me this way for, man?

BEN: Huh?

TITUS: What did you do me this way for?

BEN: I ain't I ain't did nothing. Just like I said, when it gets tight, you got to help yourself. That's what you should do.

TITUS: Yeah, but I can't lie—(inaudible word).

BEN: That ain't lying. If—if—if you remember that deal, I ain't said you did it. I said you know—if you're thinking right.

TITUS: Do what?

BEN: I said if you're thinking right.

TITUS: Yeah, but see, I couldn't blame it on somebody else like you're talking about.

BEN: Well—well—well—well, tell them who—who—who— operates.

TITUS: Huh?

BEN: Tell 'em who did it.

TITUS: Tell them who did it. Then I'd be setting myself up.

BEN: You ain't be setting yourself up. You won't be setting yourself up. Shit.

TITUS: Otherwise, I'd be putting something on somebody that don't deserve it.

BEN: If they did it, they deserve that then God damn it to—to save—to save yourself. You know how that go.

TITUS: Well, far as that goes, you know you kinda set it up, you know.

BEN: No, I ain't. I ain't did nothing.

TITUS: Well, you just talk to the lady for me and see if I can't do something.

BEN: I'll see.

TITUS: I need to get ahold of her. But I can't get ahold of her. I tried to call out there, and they won't accept the call.

BEN: Uh Huh, I don't know. I ain't seen her. I go out there and play pool and shit, and drink. Shit. Besides them horses started running now.

TITUS: Well, I can't see how—I just don't understand all this, you know. Y'all just laid me hanging out to dry. I'm going to go pretty quick, man. The time's fixing to run out on the phone. I'd appreciate y'all thinking about it—talking about it—something.

BEN: Well, I'll I'll check and see what's happening.

TITUS: I need to.

BEN: All right.

TITUS: All right.

(END OF CONVERSATION)

*See also Meador,* 811 S.W.2d at 622–24.