Edward Garner ROBERSON, Appellant,

v.

The STATE of Texas, State.

No. 2–91–246–CR.

Court of Appeals of Texas,
Fort Worth.

July 14, 1993.

Rehearing Overruled Dec. 21, 1993.

Ricky B. Perritt, Denton, for appellant.

Bruce Isaacks, Dist. Atty., Kathleen A. Walsh, Jim Crouch, and Vicki Foster, Assts., Denton, for appellee.

Before FARRIS, LATTIMORE and WEAVER, JJ.

## OPINION

FARRIS, Justice.

Edward Garner Roberson was convicted of murder and sentenced to life imprisonment. On appeal, Roberson complains the trial court erred in overruling his *Batson* complaint, in excluding the testimony of Betty R. Daniel, in refusing to allow cross-examination of the State's witnesses on their pending felony charges, and in allowing evidence of extraneous offenses. *See Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Because: the State proved it excluded venireperson Royal on a racially-neutral basis; Daniel's testimony was not crucial to the defense; excluding the evidence of pending felony charges did not disrupt the orderly evaluation of the evidence; and the extraneous offenses evidence refuted a defensive theory, we overrule Roberson's points of error and affirm the judgment.

The victim, Dr. Starling, a white male and professor at the University of North Texas, first met Roberson, a black male, a few weeks before his death. He bought Roberson some beer and paid him $50.00 for his companionship. A few weeks later, Roberson needed money and he asked some friends to drive him to Starling's house so he could borrow some. When Roberson entered the house Starling was alive; when he left he was dead.

Roberson signed a voluntary statement admitting he stabbed Starling, but claiming self-defense. Roberson claims he stabbed Starling in the thigh during a struggle which began after Starling cut Roberson's thumb for refusing his sexual advances.

In point of error one, Roberson complains the trial court erred in overruling his *Batson* complaint after the State peremptorily struck the black venirepersons. Roberson concedes the State's strike of venireperson Baty was not racially discriminatory; therefore, this point focuses only on the exclusion of venireperson Royal.

Because Roberson made a prima facie showing of discrimination, the State had the burden to come forward with a neutral explanation for challenging Royal. To determine whether the State met its burden, we review the reasons it advanced, including:

(1) Royal stated she had read newspaper articles concerning this offense;

(2) At three different times during voir dire, it appeared Royal was asleep because she had her head down and her eyes closed; and

(3) Royal had a first cousin who just a few months ago had received a life sentence in the penitentiary.

Because the record supports reason (2) and it is racially-neutral, the State met its burden.

■ The standard of reviewing a *Batson* point is the clearly erroneous standard which prohibits our disturbing the trial court's findings if they are supported by the record. *See Tennard v. State,* 802 S.W.2d 678, 680 (Tex.Crim.App.1990).

■ A litigant is clearly entitled to jurors who will pay attention to the trial. *Daniels v. State,* 768 S.W.2d 314, 317 (Tex.App.— Tyler 1988, pet. ref'd). Consistent with this right, several courts have held striking a venireperson for sleeping or inattentiveness during voir dire proceedings is racially-neutral. *See Ivatury v. State,* 792 S.W.2d 845, 848 (Tex.App.—Dallas 1990, pet. ref'd); *Holman v. State,* 772 S.W.2d 530, 533 (Tex. App.—Beaumont 1989, no pet.); *Daniels,* 768 S.W.2d at 317.

■ When the State strikes a juror on a basis that cannot easily or objectively be determined by the reviewing court, as we have in this case, that basis must be substantiated by something other than the prosecutor's statement and that something must be on the record. *See Daniels,* 768 S.W.2d at 317. Such substantiating evidence can be an admission by opposing counsel, a finding by the trial court, or an admission by the panel member.

■ In the instant case, the record from the *Batson* hearing reveals the following transpired during the State's cross-examination of venireperson Royal:

[PROSECUTOR:] Mrs. Royal, when you were sitting out here, you said you yawned a lot?

[VENIREPERSON ROYAL:] Uh-huh.

Q. Have you been tired today?

A. Yes.

Q. Okay. Did you have—did you not get a good night sleep last night or something? Or are you just tired? Sometimes it's kind of boring, I know.

A. I went to work before I came, worked a few hours, yes.

Q. Were you a little sleepy?

A. No, just yawning.

Q. Okay. **Were you aware that you had your hands folded and your eyes closed and your head down about three times?**

A. **Yes.** [Emphasis added.]

Q. You were? Okay. And would you agree with me that if—if somebody sees someone with their arms folded, their head down like this and eyes closed, you might think that they were asleep?

A. Not necessarily.

Q. You wouldn't think that somebody might be asleep if I had my head down and my eyes closed and my arms like that—

A. No.

Q.—and not moving?

A. Thinking.

Q. I beg your pardon?

A. That you would be thinking, concentrating on what you said.

Q. But you—I could—but another person could think that you were asleep possibly?

A. Possibly.

Royal admitted that on three different occasions she had her eyes closed and head down. We hold this testimony is sufficient to corroborate the basis advanced by the State. Point of error one is overruled.

■ In his second point of error, Roberson claims the trial court should have allowed Betty R. Daniel to testify because her testimony was crucial to his self-defense claim.

To rebut Roberson's self-defense claim, the State introduced testimony of the victim's peaceful and nonviolent character. After the State produced this evidence, through the testimony of three witnesses, Roberson discovered Daniel had personal knowledge of the victim's temper. Roberson filed a formal bill of exception to preserve Daniel's testimony, as follows:

[DEFENSE COUNSEL:] And prior to the date of his death, were you familiar—substantially familiar with his reputation on the campus of the University of North Texas in the community over there as a person with a temper?

[DANIEL:] Yes, at times.

Q. And did he have a temper or not?

A. To me he displayed—displayed his temper.

Q. Why do you say that?

A. We had several disagreements on the acceptance or nonacceptance of courses and on degree plans. One time in particular he—I was sitting at the switchboard in the office, and **he got rather loud and vocal.** [Emphasis added.]

Q. And did he display any anger?

A. Yes.

The trial court excluded this testimony because the "Rule" had been invoked and Daniel had been in the courtroom for approximately forty-five minutes and she had heard the testimony of one witness, Eric Knapp.

Enforcement of the "Rule" is within the sound discretion of the trial court. Its decision will not be reversed unless an abuse of discretion is shown. *Green v. State,* 682 S.W.2d 271, 294 (Tex.Crim.App.1984), *cert. denied,* 470 U.S. 1034, 105 S.Ct. 1407, 84 L.Ed.2d 794 (1985). To determine whether the trial court abused its discretion, we use a two-prong test. *Webb v. State,* 766 S.W.2d 236 (Tex.Crim.App.1989). The test is:

(1) ... were there particular circumstances, other than the mere fact of the violation, which would tend to show the defendant or his counsel consented, procured or otherwise had knowledge of the witness's presence in the courtroom, together with knowledge of the content of that witness's testimony; and

(2) if no particular circumstances existed to justify disqualification, was the excluded testimony crucial to the defense.

*Id.* at 245.

Roberson satisfied the first prong because his counsel stated he discovered Daniel knew the victim and could be a potential witness during the break after the State's witnesses testified.

To determine whether Daniel's testimony was *crucial* to Roberson's defense, we must examine the evidence it was being offered to rebut. This evidence is the testimony of Lydia Welch, Joe Welch, and Eric Knapp.

[PROSECUTOR:] During the entire, I guess that would be, 18 or 19 years that you knew Jack Starling, did he have a character for being peaceable?

[LYDIA WELCH:] Yes.

Q. Nonviolent, in other words?

A. Nonviolent, Yes.

> ....

[PROSECUTOR:] Dr. Welch, during the 20 years that you knew Dr. Starling, did you know his reputation in the community for being a peaceful and nonviolent person?

[JOE WELCH:] Yes.

Q. Okay. And was that—what was that reputation?

A. The reputation was—what I knew of Jack Starling was that he was—was totally peaceful and nonviolent.

> ....

Q. From your own personal knowledge and what you saw over the 20 years that you knew Dr. Starling, did you ever know him to be a violent person?

A. No.

> ....

Q.—did you ever personally view Dr. Starling to be a violent person?

A. No.

> ....

[PROSECUTOR:] Now, Mr. Knapp, during the at least 17 years that you knew Dr. Starling, did you know his reputation for being a nonviolent person?

[ERIC KNAPP:] I did. He was not violent. He was never violent.

Q. And during that time were you personally present when Jack Starling was met with aggressive behavior and he acted in a nonviolent nature?

A. Yes.

Q. . Okay. And can you tell the jury about that?

A. Well, there were several things. When someone hit his car and he—he just went on. He didn't want—he wouldn't· go into conflict. He would just walk away from it. He didn't like conflict. And once I got into a scuffle with him and, you know, he wouldn't—he would not—he was not violent. You couldn't provoke him to violence.

Q. Did you push him or—

A. Yeah, I pushed him.

Q. But he wouldn't—he wouldn't fight back?

A. Right.

> ....

[DEFENSE COUNSEL:] So if he had a reason, he did get angry. Is that what you're saying?

[ERIC KNAPP:] No.

Q. What are you saying?

A. He wasn't—Jack wasn't physically violent at all. **He might raise his voice,** but he was not—he was not physically violent. He would never hit you, or he would never touch you or do anything like that. **He would raise his voice.** [Emphasis added.]

This testimony establishes the nonviolent and nonaggressive character of the victim. The proffered testimony of Daniel does not rebut this; instead, it corroborates the testimony defense counsel elicited from defense witness Knapp. Roberson did not pass the second prong. Therefore, we hold the trial court did not abuse its discretion in excluding Daniel's testimony because it was not *crucial* to his defense and it is cumulative. Point of error two is overruled.

■ In point of error three, Roberson contends his constitutional right to confront the witnesses against him was violated because the trial court refused to allow him to ques-

tion certain witnesses on their pending felony charges to show their bias and motive to testify against him.

In *Davis*, the Supreme Court recognized, "the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." *Davis v. Alaska*, 415 U.S. 308, 315, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347, 354 (1974). Roberson was denied the right to show possible biases, prejudices, or ulterior motives of the witnesses because of their vulnerable status. Having found the trial court erred in this regard, we must now conduct a harm analysis.

In applying the harmless error rule, our focus is not on the propriety of the outcome of the trial, but on the integrity of the process leading to the conviction. *Harris v. State*, 790 S.W.2d 568, 584–87 (Tex. Crim.App.1989); Tex.R.App.P. 81(b)(2). This involves examining the source of the error, the nature of the error, whether or to what extent it was emphasized by the State and its collateral implications. *Id.* at 587. In addition, we must consider how much weight a juror would probably place upon the error and whether declaring the error harmless would encourage the State to repeat it with impunity. *Id.* If the error is of a magnitude that it disrupted the jury's orderly evaluation of the evidence, no matter how overwhelming such evidence might have been, then the conviction is tainted. *Id.* at 588.

The source of the error in the instant case is that Roberson was prevented from informing the jury that witnesses Dorothy Linson, Harrison "Bud" McCreary, and Gerald Berry had felony charges pending against them. The nature of this error is that Roberson was denied the opportunity to show the jury these witnesses may have fabricated their testimony because of an alleged promise of leniency in an unrelated criminal matter. After the trial court sustained the State's objections, neither side mentioned the status of these witnesses again.

We cannot say exclusion of the pending felony charges in any way disrupted the jury's orderly evaluation of the evidence be-

cause: the substance of all three witnesses' testimony was cumulative of other evidence; it was never established that Linson or Berry made a deal with law enforcement authorities; McCreary volunteered the information Roberson sought; and each witness's testimony matched the statement he or she gave to the police before the felony charges were filed against them and the basis for bias existed. Further, the pending felony charges were not final convictions within the meaning of Tex.R.Crim.Evid. 609. Therefore, we conclude the error in denying Roberson the opportunity to question Linson, McCreary, and Berry about their pending felony charges was harmless beyond a reasonable doubt. Tex.R.App.P. 81(b)(2). Point of error three is overruled.

In his last point of error, Roberson complains testimony concerning extraneous offenses that occurred several hours after the stabbing was erroneously admitted. This evidence included testimony that Marsha Harris and Dorothy Linson, friends of Roberson's, drove him to the victim's house two to three hours after the stabbing. They waited while he went inside and returned with a television and VCR which he said were his. At 3:00 a.m., approximately four hours after the stabbing, Roberson asked Benjamin Ogden if he wanted to buy a television or some jewelry. At 7:00 a.m., ten hours after the stabbing, Roberson went back to the victim's house and was seen by a neighbor leaving in the victim's Lincoln Continental automobile. Later, Roberson drove the car to Fort Worth to sell the tires.

Proof of an extraneous offense may be admissible at the guilt-innocence phase of trial if it illuminates a material issue in that case. *See Crank v. State*, 761 S.W.2d 328, 340–45 (Tex.Crim.App.1988). Roberson claims the extraneous offenses are not relevant to any material issue in this case because he admitted he stabbed Starling.

Extraneous offense evidence is admissible to prove motive and to *refute a defensive theory* raised by the accused. *See Williams v. State*, 662 S.W.2d 344, 346 (Tex. Crim.App.1983). The State offered this evidence to show that Roberson's motive and

intent when he killed Starling was to get his belongings. This evidence challenges Roberson's self-defense theory which Roberson admits was a contested material issue. Therefore, the evidence was relevant. *See* TEX. R.CRIM.EVID. 404(b).

Relevant evidence is admissible if its relevancy outweighs its prejudicial potential. TEX.R.CRIM.EVID. 403; *Porter v. State,* 623 S.W.2d 374, 385 (Tex.Crim.App.1981). In this case, the prejudicial potential of the evidence was minimized by the court's limiting instruction that the evidence of extraneous offenses was to be considered for the purpose of intent and motive only. Therefore, we hold the trial court did not err in admitting the complained-of evidence. Point of error four is overruled.

The trial court's judgment is affirmed.